IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ROBERT VENCENT VASQUEZ,

      Plaintiff,

vs.                                 No. CIV 22-0593 JB/DLM

NEW MEXICO DEPARTMENT OF
CORRECTIONS; ALISHA TAFOYA-
LUCERO, in her individual and official
capacity; THE WARDEN OF THE
PENITENTIARY OF NEW MEXICO;
DAVID S. FAJARDO or SHARLENE
HAGERMAN, in her individual and official
capacity; THE WARDEN OF GCCF OF
SANTA ROSA, JULIAN MARQUEZ, in his
individual and official capacity;
CORRECTIONS OFFICERS ANGEL
SANCHEZ and ANDRES SANCHEZ, in
their capacity as New Mexico Department of
Corrections Officers and in their individual
capacities, and DANIEL SEDILLO, in his
individual and official capacity,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on the Plaintiff's Second Motion to Amend

Complaint, for Extension of Number of Exhibit Pages, and Motion to Seal, filed April 27, 2025

(Doc. 106)("Second Motion to Amend").  The Court held a hearing on August 14, 2025.  <u>See</u>

Clerk's Minutes filed August 14, 2025 (Doc. 117); Draft Hearing Transcript of Proceedings at 1

(taken August 14, 2025)(Court)("2025 Tr.").[1]  The primary issues are: (i) whether the Court should

grant the Second Motion to Amend, where the Plaintiff provides new factual support for his claims

not present when the Court previously dismisses the Plaintiff's Amended Complaint for Violation

---

[1] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

of Constitutional [sic] Rights and Request for Declaratory and Injunctive Relief as it Pertains to the Fourteenth and Eight Amendment Violations and Discrimination Under the Americans with Disabilities [sic] Act, filed September 12, 2022 (Doc. 11)("FAC"); (ii) whether the Court should seal the identities of the Plaintiff, Witness One, and Witness Two, where their identities are publicly available in a separate action; and (iii) whether the Court should grant the Plaintiff's request to extend the number of pages and exhibits, where the Plaintiff's Second Motion to Amend exceeds the page limit by thirty two pages.  The Court: (i) grants in part the Second Motion to Amend, as to the Plaintiff's § 1983 claim, where the Plaintiff provides new factual support for his claims not present when the Court previously dismisses the FAC, because the Court finds the new factual support troubling and justice requires the amendment as to Count I, Count II, and Count III against Defendants STIU[2] Angel Sanchez and Sergeant Andres Sanchez and the Court will deny in part the Second Motion to Amend, as to Count IV, because the Plaintiff does not state a claim that the grievance process discriminates against him because of his disability; (ii) will not seal the matter but will mask the identities of the Plaintiff, Witness One, and Witness Two, where their identities are publicly available in a separate action, because proceeding without masking them here poses a risk of harm that outweighs the public's interest in fully open proceedings; and (iii) grants the Plaintiff's request to extend the number of pages and exhibits, where the Plaintiff's motion exceeds the page limit by thirty two pages, because the Defendants do not oppose this request.

**FACTUAL BACKGROUND**

The Court draws the relevant facts from the Plaintiff's Proposed Second Amended Civil Rights Complaint and Request for Declaratory and Injunctive Relief, filed April 27, 2025

---

[2] Although the Plaintiff does not define "STIU," the Court understand the Plaintiff's use of "STIU" to refer to the Security Threat Intelligence Unit within NMCD.  New Mexico Correction Department, Office of Security Threat Intelligence, https://www.cd.nm.gov /divisions/adult-prisons/office-of-security-threat-intelligence/ (last visited Feb. 24, 2026).

(Doc. 106-1)("SAC").  The Court previously set forth the factual background in detail when ruling on the Defendants' Motion to Dismiss Amended Complaint for Violation of Constitutional Rights and Request for Declaratory and Injunctive Relief as it Pertains to the Fourteenth and Eighth Amendment Violations and Discrimination Under the Americans with Disabilities Act and for Qualified Immunity, filed October 10, 2022 (Doc. 16)("MTD"), and the SAC does not materially alter that account.  Accordingly, the Court recounts the background only briefly here and addresses primarily the limited additional factual allegations the Plaintiff now offers.  For a more complete discussion of the underlying facts, the Court refers to its prior Memorandum and Opinion at 3-6, filed August 29, 2024 (Doc. 81)("MO"); Vasquez v. New Mexico Dep't of Corr., No. CIV 22-0593 JB/DLM, 2024 WL 3992385 at *1-2 (D.N.M. Aug. 29, 2024).  The Court first describes the additional allegations supporting Counts I and II, including affidavits from Witness One and Witness Two concerning the Defendants Angel Sanchez and Andres Sanchez' conduct.  The Court then turns to the supplemental allegations relevant to Count III, drawn from Witness Two's affidavit, and finally the Court discusses the additional factual support Plaintiff advances for Count IV against Defendant New Mexico Corrections Department ("NMCD").

> 1.    **COUNT I and II: The Plaintiff's Claims for Violation of the First and Eighth Amendments to the Constitution of the United States Against Angel and Andres Sanchez.**

In Count I and II, the Plaintiff alleges that Angel Sanchez and Andres Sanchez "conspired to place Plaintiff in E-Pod, Unit 2 . . . for the purpose of having [Plaintiff] killed or seriously injured."  SAC ¶ 140, at 37.  According to the Plaintiff, Angel Sanchez and Andres Sanchez conspire to retaliate against him for "the filing of the grievance and the civil right complaint against" them.  SAC ¶ 140, at 37 (citing Plaintiff v. N.M. Dep't of Corr., No. CIV 22-0522, 2024 WL 1282766 (D.N.M. March 26, 2024)(Strickland, J.)).  The Plaintiff asserts, in Count I, that this retaliation violates his Eighth Amendment, because labeling him as a "snitch" unreasonably

subjects him to the threat of substantial risk of serious harm at the hands of his fellow inmates. SAC ¶142, at 38.   In Count II, the Plaintiff asserts that Angel Sanchez and Andres Sanchez, moreover, violate the First Amendment, because the conspiracy causes him "injuries that would chill a person of ordinary firmness from continuing to engage in the activity he was legally involved in."  SAC ¶ 156, at 41-42.

In carrying out the conspiracy, on or about June 12, 2022, Andres Sanchez informs E-Pod's inmates that the NMCD will soon transfer the Plaintiff to Guadalupe County Correctional Facility's ("Guadalupe Corrections") E-Pod and that the Plaintiff is a "'snitch.'"  SAC ¶ 31, at 8 (quoting the Affidavit of Witness One (May 28, 2024), filed April 27, 2025 (Doc. 106-Exhibit 1)("Witness One Aff.") and the Affidavit of Witness Two (August 12, 2024), filed April 27, 2025 (Doc. 106-Exhibit 2)("Witness Two Aff.").[3]  On June 24, 2022, the NMCD moves the Plaintiff from the Penitentiary of New Mexico ("PNM") to the Guadalupe Corrections, where then, corrections officers Angel Sanchez and Andres Sanchez met him.  FAC ¶¶ 13-14, at 4-5.  At that time, Angel Sanchez and Andres Sanchez ask the Plaintiff "if he had any enemies at the Guadalupe Corrections and if he was going to have 'problems' because he was 'APA.'"  SAC ¶ 13, at 4.[4]  They also inform the Plaintiff that "they all needed to put the matter behind them," which the Plaintiff understands as referring to his original lawsuit against the Sanchez brothers.  SAC ¶ 14, at 4-5. Angel Sanchez and Andres Sanchez then take the Plaintiff to his cell, and, "[w]ithin five minutes"

---

[3] Although the Plaintiff does not define the acronyms in his SAC, the Court understands the Plaintiff to refer to the Guadalupe County Correctional Facility where he uses "GCCF," and the Court understands the Plaintiff to refer to the Penitentiary of New Mexico where he uses "PNM."

[4] Although the Plaintiff does not define the "APA" and the Court has been unable to determine what the acronym means, the Court understands the Plaintiff's use of "APA" to refer to the NMCD's mental health unit.  See FAC ¶ 44, at 17 ("Plaintiff has been housed in the NMCD's (APA) Mental Health Unit in Santa Fe . . . .").

of being alone, inmates from E-Pod attack and stab the Plaintiff.  SAC ¶ 18, at 5.  During the assault, the Plaintiff presses the emergency call button for help, see SAC ¶ 19, at 5, but "the Defendants and others" take approximately twenty minutes to respond, SAC ¶ 21, at 5.  In the period of time between the Plaintiff pressing the emergency call button and officers arriving, the Plaintiff "attempted to retreat from his assailants but suffered a second attack and beating during the wait."  SAC ¶ 22, at 6.  The NMCD sends the Plaintiff to the hospital, he eventually recovers from the attack, and then returns to the Guadalupe Corrections.  SAC ¶ 28, at 7.

In May, 2024, the Plaintiff "was incarcerated at the NENMCF in Clayton, New Mexico."[5] SAC ¶ 29, at 7.  While in the Northeast New Mexico Correctional Facility ("Northeast Corrections"), he encounters Witness One.  See SAC ¶ 29, at 7.  Witness One explains to the Plaintiff that Andres Sanchez, in June, 2022, labels the Plaintiff as a "snitch."  SAC ¶ 29, at 7-8. Specifically, as the Plaintiff recounts the telling, on June 12, 2022, Witness One is

> sitting at a table in housing 2 E-Pod in the GCCF when . . . Sgt. Andres . Sgt. Andres Sanchez came to the front window of E-Pod and called him and other inmates up to the window and informed them that [the Plaintiff] was a 'snitch' and that he then placed a complaint and grievance filed by [the Plaintiff] against the pod window and that Sgt. Andres Sanchez informed the inmates that [the Plaintiff] would soon be transferred into their pod.

SAC ¶ 29, at 7-8 (quoting Witness One Aff.).  In August, 2024, the Plaintiff encounters Witness Two, who gives the same account of Andres Sanchez' actions in June, 2022, as Witness One gives because he also is in the E-Pod when Andres Sanchez shows the inmates "the lawsuit and grievance [that the Plaintiff] had filed against the Defendants. . . ."  SAC ¶ 31, at 8.

**2.**   **COUNT III: The Plaintiff's Claim for Violation of the First and Eighth Amendments Against Angel Sanchez and Andres Sanchez, Regarding the Intimidation of Witness Two.**

---

[5] Although the Plaintiff does not define "NENMCF," the Court understands the Plaintiff to refer to the Northeast New Mexico Correcional Facility.

In Count III, the Plaintiff alleges that Angel Sanchez and Andres Sanchez "conspired to intercept material witness and assailant [Witness Two] when he was returned to the GCCF from UNMH to intimidated him into remaining quest about the fact that the Defendants had labeled [the Plaintiff] a 'snitch.'"  SAC ¶ 159, at 42.[6]  According to the Plaintiff, Angel Sanchez and Andres Sanchez intercept Witness Two to prevent him from discovering evidence "he needed to assert his First and Eighth Amendment constitutional rights."  SAC ¶ 159, at 42.  On June 24, 2022, during the E-Pod's initial assault on the Plaintiff, he is able "to take a shank away from one of his assailants, [Witness Two,] and used it against him in defense."  SAC ¶ 20, at 5.  After the assault, Guadalupe Corrections transports Witness Two to UNMH.  See SAC ¶ 25, at 6.  When the Plaintiff encounters Witness Two at Northeastern Corrections in August, 2024, Witness Two tells the Plaintiff

> 'I was transported back to GCCF the next morning.  As I was being escorted to segregation down the main hall Angel and Andres Sanchez pulled me into an office with a blind spot from the camera and told the escort officer to leave.  Andres Sanchez then asked me "do you know him now".  I told both Andres and Angel Sanchez I did not know what they were talking about because I believed this was the answer they wanted and feared for my safety.  Angel said to Andres that I would not say anything and let me leave unharmed. . . .'

SAC ¶ 39, at 11 (quoting Witness Two Aff.).  The Plaintiff asserts that the Sanchez brothers initiate this conversation with Witness Two to prevent him from "informing the state police and the GCCF personnel who were investigating the incident that Andres Sanchez had caused."  SAC ¶ 41, at 12.

**3.      COUNT IV: The Plaintiff's Claim for a Violation of the ADA and the Rehabilitation Act of 1973 Against NMCD.**

The Plaintiff alleges that NMCD takes advantage of him, because of his disabilities, when it refuses to accommodate him in preparing or maintaining grievances against NMCD, or against

---

[6] Although the Plaintiff does not define "UNMH," the Court understands the Plaintiff to refer to the University of New Mexico Hospital.

the NMCD correction officers. See SAC ¶ 90, at 24. The Plaintiff contends he classifies "as 'retarded' (IDD), and . . . he has been diagnosed with Bi-Polar Personality Disorder, Post Traumatic Stress Disorder, Major Depressive Disorder (MDD), Anti-Social Disorder, and has developed a very serious drug addiction." SAC ¶ 88, at 24. As a result, he "depends on fellow inmates to help him prepare correspondence, legal documents and grievances." SAC ¶ 89, at 24. That support, however, is not always effective, because NMCD challenges his lawsuits in federal court as not compliant with 42 U.S.C. § 1997e(a)'s exhaustion requirements. See SAC ¶ 91, at 24-25.

After the assault, Guadalupe Corrections transfers the Plaintiff to PNM where he attempts to file a grievance against Angel Sanchez and Andres Sanchez. See SAC ¶ 92, at 25. The Plaintiff informs Grievance Officer Daniel Sedillo about his suspicions regarding Angel Sanchez and Andres Sanchez' involvement with his attack. See SAC ¶ 92, at 25. He tells Sedillo that "he needed assistance [an accommodation] from Mr. Sedillo to prepare and maintain a proper grievance because he had mental disabilities." SAC ¶ 92, at 25 (alteration in the original). The Plaintiff, furthermore, explains to Sedillo that "he didn't understand fully how to file the necessary grievance or to maintain it." SAC ¶ 92, at 25. Sedillo explains to the Plaintiff "that he could not help him prepare a grievance or maintain it, and showed him the grievance policy CD-150501 (H) Grievance Officer-Investigation and Report Administration Responsibilities," SAC ¶ 92, at 25, and explains that the Plaintiff "had to find another inmate to assist him in preparing grievances," SAC ¶ 117, at 31.

The Plaintiff asserts that CD-150500 and CD-150501 do "not have any mandate or procedure to assist inmates who have mental disabilities to prepare or maintain a grievance." SAC ¶ 93, at 25. As the Plaintiff reads the polices, they allow grievance officers only "to provide informational assistance to the inmate as to the proper grievance process." SAC ¶ 117, at 31. This

observation is consistent with the Plaintiff's experience in January, 2019, when Grievance Officer Janine Rodriguez "denied Plaintiff's request for an accommodation and informed Plaintiff that she could not assist him in preparing any grievances." SAC ¶ 135, at 36. As with this action, the Plaintiff relies on other inmates to assist him in filing the grievance. See SAC ¶ 135, at 36. In November, 2019, a State court dismisses that grievance, because the Plaintiff "did not file any timely grievance." SAC ¶ 136, at 36. CD-150500 and CD-150501, according to the Plaintiff, violate the Rehabilitation Act and the ADA (collectively the "Acts"), because mentally disabled inmates are unable to satisfy the exhaustion requirement, and therefore, cannot litigate their cases in federal court. SAC ¶¶ 95-98, 25-26. NMCD is a public entity under the Acts, see SAC ¶ 120, at 32, and it has access to inmates' disabilities from evaluations NMCD mental health providers perform on them, see SAC ¶¶ 129-30, at 34. NMCD performs these evaluations on an inmate "upon entry into the custody" of it. SAC ¶ 128, at 33. Despite this knowledge and the Plaintiff's request for an accommodation, Sedillo does not assist him in filing a grievance. See SAC ¶ 134, at 35. The Defendants now seek to dismiss this action, "because Plaintiff did not properly file a grievance and therefore he did not exhaust his administrative remedies and that he is precluded from pursing the present lawsuit." SAC ¶ 134, at 35.

## **PROCEDURAL BACKGROUND**

The Court begins by outlining the events that leads to the filing of the Second Motion to Amend and then briefly reviews its prior MO, which dismisses the FAC. Next, the Court summarizes the Defendants' Response to Plaintiff's Second Motion to Amend Complaint, for Extension of Number of Exhibit Pages, and Motion to Seal, filed May 30, 2025 (Doc. 108)("Defendants' Response"). Last, the Court discusses the Reply in Support of Plaintiff's Second Motion to Amend Complaint, for Extension of Number of Exhibit Pages, and Motion to Seal, filed June 27, 2025 (Doc. 110)("Plaintiff's Reply").

**1.      The Second Motion to Amend.**

The Court enters an Order, filed September 29, 2023 (Doc. 45)("Order"), granting the MTD.  The Order dismisses the Plaintiff's claims with prejudice.  See Order at 21.  The Court drops a footnote stating: "The Court will issue at a later date, however, a Memorandum Opinion more fully detailing its rationale for this decision."  Order at 1 n.1.  The Court does not enter a Final Judgment.

Seventeen days later, on October 16, 2023, the Plaintiff files a notice of appeal from the Order.  See Notice of Appeal at 1, filed October 16, 2023 (Doc. 47)("NOA").  The United States Court of Appeals for the Tenth Circuit does not dismiss the appeal, but writes:

> This matter is before the court upon review of the appellant's docketing statement.  It is unclear whether the district court has issued a final decision in this case.  Although the district court's September 29, 2023 Order appears to have resolved all claims in the case, that Order expressly states that "The Court will issue at a later date, however, a Memorandum Opinion more fully detailing its rationale for this decision." ECF No. 45, n.1.  In an abundance of caution, this court will abate this appeal pending the district court's entry of the Memorandum Opinion detailing its rationale.  The appellant shall notify this court within five days after the district court issues its Memorandum Opinion.

No. 23-2164, Order, filed October 27, 2023 (Doc. 14).

On August 29, 2024, the Court files its promised opinion.  See MO at 1.  See Plaintiff v. New Mexico Dep't of Corr., No. CIV 22-0593 JB/DLM, 2024 WL 3992385 at *1 n.1 (D.N.M. Aug. 29, 2024)(Browning, J.).  Normally, the Court would have entered a Final Judgment on this opinion.  Before the Court files the MO, however, the Plaintiff files a Motion to Set Aside Order, filed June 14, 2024 (Doc. 65)("Set-Aside Mot.").  The Court looks at the declarations attached to the Set-Aside Mot. and determines that the declarations might, if the Plaintiff pleads the allegations in the amended complaint, get the Plaintiff over the Twombly/Iqbal threshold to state a claim for violations of his Fourteenth and Eighth Amendment rights under color of state law, and for

discrimination under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  The Court does not enter a Final Judgment.

### 2.    The Prior MO.

On August 29, 2024, the Court files the MO, dismissing the FAC, pursuant to rule 12(b)(6), for failure to state a claim upon which the Court can grant relief.  See MO at 31.  In the FAC, the Plaintiff brings: (i) Eighth Amendment claims against Andres Sanchez, Angel Sanchez, Julian Marquez, and Alisha Tafoya-Lucero, alleging the inmates assault him in retaliation for filing grievances, see MO at 32; and (ii) Eighth Amendment claims and claims for violations of § 504 of the Rehabilitation Act against Sedillo, Sharlene Hagerman and/or David S. Fajardo, Tafoya-Lucero, and the NMCD, alleging inadequate grievance procedures, see MO at 48.[7]  The SAC does bring claims against Marquez, Tafoya-Lucero, or Fajardo/Hagerman; accordingly, the Court focuses on the MO as it relates to the claims the Plaintiff now brings against Andres Sanchez, Angel Sanchez, and the NMCD.

### a.    The Plaintiff's Eighth Amendment Claim against Angel Sanchez and Andres Sanchez.

The Plaintiff does not state an Eighth Amendment claim against Angel Sanchez and Andres Sanchez.  See MO at 32.  The Court begins by explaining that, to state an Eighth Amendment claim against Angel Sanchez and Andres Sanchez for labeling him as a snitch or for failing to protect him from the inmates' assault, the Plaintiff "'must show that he is incarcerated under conditions posing a substantial risk of serious harm . . . and that the prison official was deliberately indifferent to his safety.'"  MO at 39 (quoting Verdencia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003)).  In

---

[7] Tafoya-Lucero is the Secretary of Corrections of the New Mexico Corrections Department, Marquez is the Warden of GCCF, and Hagerman and/or Fajardo is the Warden of PNM.  See FAC ¶¶ 8-10, at 3-4.

regard to labeling the Plaintiff as a snitch, in the FAC, the Plaintiff offers no factual context other than the interaction with Angel Sanchez and Andres Sanchez, where they express unhappiness about the Plaintiff's litigation against them. See MO at 40. This factual support alone, the Court concludes, "is insufficient to 'nudge[ his] claims across the line from conceivable to plausible.'" MO at 40 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)("Twombly"))(alterations in the MO, but not in Twombly). "Likewise, the only non-conclusory fact that [the Plaintiff] puts forth regarding his contention that Angel Sanchez and Andres Sanchez allowed him to be attacked, is that it took twenty minutes for help to arrive." MO at 40 (citing FAC ¶ 24, at 8; Fisher v. Oklahoma Dep't of Corr., 213 F. App'x 704, 708-09 (10th Cir. 2007)("Plaintiffs' allegations that Mr. Yott read their letters to the other inmates intending that those inmates would injure plaintiffs are conclusory."))[8]. The Court notes that the Plaintiff's well-pled allegations "'encompass a wide swath of conduct,'" some of which may be innocent conduct, MO at 41 (quoting Robbins v.

---

[8] Fisher v. Oklahoma Dep't of Corr. is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The United States Court of Appeals for the Tenth Circuit states:

In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Fisher v. Oklahoma Dep't of Corr., Gossett v. Barnhart, 139 F. App'x 24 (10th Cir. 2005), Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004), Nard v. City of Okla. City, 153 F. App'x 529 (10th Cir. 2005), Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006), Paris v. Sw. Bell Tel. Co., 94 F. App'x 810 (10th Cir. 2004), Lobozzo v. Colorado Dep't of Corr., No. 10-1396, 429 F. App'x 707 (10th Cir. 2011), Routt v. Howry, No. 19-6187, 835 F. App'x. 379 (10th Cir. 2020), Grove v. Groome, 817 F. App'x 551 (10th Cir. 2020), Rife v. Jefferson, No. 17-7037, 742 F. App'x 377 (10th Cir. 2018), Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, No. 16-2222, 707 F. App'x. 552 (10th Cir. 2017), Brown v. City of Colo. Springs, No. 16-1206, 709 F. App'x. 906 (10th Cir. 2017), and Grove v. Groome, 817 F. App'x 551 (10th Cir. 2020), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008), and do not permit it to "'infer more than the mere possibility of misconduct,'" MO at 41 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)("Iqbal")).  In dismissing the Eighth Amendment claim against Angel Sanchez and Andres Sanchez, the Court remarks that, "even viewed in the light most favorable to [the Plaintiff], the 'mere assertion that he believes,' that Angel Sanchez and Andres Sanchez retaliated against him by having him attacked is not enough to state a valid Eighth Amendment claim."  MO at 42 (quoting Al-Owhali v. Holder, 687 F.3d 1236, 1243 (10th Cir. 2012)).  The Court now turns to the MO's analysis of the Plaintiff's claims against the NMCD.

> **b.      The Plaintiff's Eighth Amendment and Rehabilitation Act Claims Against the NMCD.**

Regarding the grievance procedures, the Plaintiff does not state an Eighth Amendment claim or a Rehabilitation Act claim against the NMCD.  See MO at 48.  The Court begins with the Eighth Amendment claim, summarily stating that NMCD is a State agency, and the Plaintiff cannot be sue a State agency under 42 U.S.C. § 1983, because it is not a "person."  MO at 50 (citing Plaintiff v. Tafoya-Lucero, No. CIV. 20-612, 2023 WL 110974, at *5 (D.N.M. January 5, 2023)(Sweazea, J.)(quoting 42 U.S.C. §  1983), report and recommendation adopted, No. CIV 20-612, 2023 WL 2012504 (D.N.M. Feb. 15, 2023)(Brack, J.).  As for the § 504 of the Rehabilitation Act, the Court concludes that the FAC does not allege sufficient facts to state claim.  See MO at 55.

To state a claim under the Rehabilitation Act, the Plaintiff must demonstrate that: (i) he is handicapped under the Rehabilitation Act; (ii) he is otherwise qualified to participate in the program; (iii) the program receives federal financial assistance; and (iv) the program discriminates against the Plaintiff based upon his disability.  See MO at 55 (citing Hollonbeck v. U.S. Olympic Comm., 513 F.3d 1191, 1194 (10th Cir. 2008)).  The Plaintiff provides facts supporting the first

three elements, but the FAC does not specify "that the grievance process discriminates against him in any way or that any alleged discrimination was 'based upon' his disability."  MO at 56 (quoting Havens v. Colo. Dep't of Corr., 897 F.3d at 1262).  The Plaintiff does not allege sufficient facts to meet the fourth element, because the only statements in the FAC that NMCD intentionally discriminates against the Plaintiff are "too conclusory to state a plausible claim and constitute only a 'formulaic recitation of the elements of a cause of action,'" MO at 56 (quoting Iqbal, 556 U.S. at 678); likewise, the Plaintiff's disparate impact allegation about an "'unwritten policy' of denying disabled inmates' grievances 'as punishments on the inmates'" is equally conclusory and without factual support,  MO at 56-57 (quoting FAC ¶ 65, at 42).  "In conclusion, the Court concludes that [the Plaintiff] has not stated a claim under § 504 claim, because he has not alleged sufficiently that the Defendants discriminated against him on the basis of his disability."  MO at 58 (citing Plaintiff v. Tafoya-Lucero, 2023 WL 2012504, at *4 (concluding that the Plaintiff's allegations that NMCD took advantage of his mental disabilities does not constitute a denial of access to services, program, or activities because of his disability)).

> 3.      The Defendants' Response.

On May 30, 2025, the Defendants file the Defendants' Response, which opposes in part and does not oppose in part the Second Motion to Amend.  See Defendants' Response at 1-2.  The Court first discusses the unopposed amendments to the FAC, which involve procedural and substantive issues.  See Defendants' Response at 1-2.  Next, the Court outlines the opposed amendments, which include claims against Andres Sanchez, Angel Sanchez, and the NMCD.  See Defendants' Response at 2-3.

>> a.      The Unopposed Amendments.

The Defendants do not oppose three amendments in the Second Motion to Amend.  See Defendants' Response at 1-2.  First, the Defendants "do not oppose plaintiff's request to extend

- 13 -

the number of pages for exhibits." Defendants' Response at 1. Second, the Defendants do not oppose the motion to the extent that the Plaintiff no longer seeks to maintain claims against Tafoya-Lucero, Fajardo or Hagerman, Marquez, and Sedillo.[9] See Defendants' Response at 2. Finally, the Defendants state:

> [W]ithout waiving a subsequent ability to file a motion to dismiss and/or motion for summary judgment on the following claims, Defendants do not oppose Plaintiff's request to amend his complaint to add an Eighth Amendment claim against Andres Sanchez in his individual capacity for the alleged deliberate indifference to a substantial risk of serious harm to Plaintiff, nor Plaintiff's First Amendment claim against Andres Sanchez in his individual capacities for the alleged speech-related retaliation.

Defendants' Response at 2.

### b.      The Opposed Amendments.

The Defendants oppose three amendments in the Second Motion to Amend. See Defendants' Response at 1-2. First, the Defendants oppose the Plaintiff's request to seal the record, because "another Judge in this district recently denied a similar motion by Plaintiff requesting to seal the exact same document that Plaintiff had filed publicly." Defendants' Response at 1. Consequentially, the Defendants view the motion to seal as futile. See Defendants' Response at 2. Next, the Defendants "oppose all of Plaintiff's proposed claims against Angel Sanchez as futile," and any new claims under 42 U.S.C. § 1985. Defendants' Response at 2. Finally, the Defendants oppose the Plaintiffs ADA and Rehabilitation Act claims. See Defendants' Response at 2.

The Defendants assert that the Plaintiff "fails to state a claim of conspiracy in Counts I, II, and III" against Angel Sanchez. Defendants' Response at 9. According to the Defendants, Count

---

[9] In the FAC, the Plaintiff brings claims against NMCD, Tafoya-Lucero, in her individual and official capacity, Fajardo or Sharlene, in their individual and official capacities, Marquez, in his individual and official capacity, Angel Sanchez and Andres Sanchez, in their individual and official capacities, and Sedillo, in his individual and official capacity. See FAC at 1. In the Second Motion to Amend and the SAC, however, the Plaintiff maintains claims against only Andres Sanchez, Angel Sanchez, and NMCD. See SAC at 1.

I fails, which is the Plaintiff's Eighth Amendment claim against both Angel Sanchez and Andres Sanchez, because a civil conspiracy requires the combination of two or more persons acting in concert, and the facts that the Plaintiff pleads show only that Andres Sanchez acts to label him a snitch. See Defendants' Response 9-10. Accordingly, the Defendants assert that there is no "plausible allegation that there was a meeting of the minds between Angel and Andres Sanchez for Andres to tell inmates that Plaintiff had filed a lawsuit or grievance . . . ." Defendants' Response at 10. Count III, according to the Defendants, "fails for the same reason: Plaintiff fails to allege a meeting of the minds between Andres and Angel Sanchez." Defendants' Response at 10. The Defendants argue that, when Angel Sanchez and Andres Sanchez pull Witness Two aside, Angel Sanchez does not understand that Andres Sanchez intends to intimidate him. "Plaintiff not only fails to allege a conspiracy or any meeting of the minds between Angel and Andres Sanchez to intimidate [Witness Two], but his allegations defeat such an inference." Defendants' Response at 11. As to Count II, the Defendants assert that the Plaintiff "fails to allege that Angel Sanchez took any action which cause Plaintiff to suffer injuries that would chill a person of ordinary firmness from continuing to engage in the protected activity." Defendants' Response at 11. Finally, in regard to the remaining allegations against Angel Sanchez, the Defendants argue that the Plaintiff "has not alleged that Angel Sanchez violated his clearly established constitutional right." Defendants' Response at 12. According to the Defendants, without showing that Angel Sanchez violates a clearly established Constitutional right, "Angel Sanchez is entitled to qualified immunity," and, consequentially, the Defendants assert that "allowing Plaintiff to amend his complaint to add this claim would be futile, and Plaintiff's request to amend his complaint to add this claim should be denied." Defendants' Response at 12.

The Defendants assert the claims against NMCD, regarding the Rehabilitation Act and the ADA, are futile. See Defendants' Response 12-20. The Defendants make several arguments in

support of their assertion.  See Defendants' Response 12-20.  First, the Defendants argue that "Congress did not, in enacting the ADA, waive the State of New Mexico's Eleventh Amendment for a disabled inmate to have access to the prison grievance process."  Defendants' Response at 13.  This legal conclusion is clear, according to the Defendants, because there is "no constitutional right [] at issue: neither the Eighth nor Fourteenth Amendment are violated by issues with a prison grievance system."  Defendants' Response at 13.  Accordingly, the "amendment of Plaintiff's Complaint to add such a claim would be futile and should be denied."  Defendants' Response at 14.  The second argument that the Defendants make applies both to the Rehabilitation Act and to the ADA.  See Defendants' Response at 14-15.  The Defendants asserts that, because § 504 of the Rehabilitation Act and Title II of the ADA "are nearly identical," they can be "analyzed together under the same standard."  Defendants' Response at 15 (citing Miller ex rel. S.M. v. Bd. of Educ., 565 F.3d 1232, 1245 (10th Cir. 2009)).  The Defendants assert that both claims under either statute fail, because the "grievance policy (and, as Plaintiff alleges it, the offer to provide only informational assistance) applies to all inmates, regardless of whether they have a disability."  Defendants' Response at 16.  The Defendants argue that, because the policy applies regardless of disability, the Plaintiff cannot "demonstrate any alleged discrimination was by reason of his disability."  Defendants' Response at 16.  As a matter of disparate impact, the Defendants note that, if the "Plaintiff in fact demonstrate that he was wrongly thwarted in his attempt to exhaust the administrative remedies afford by the grievance process, then Plaintiff can establish that he is entitle to pursue his claims without exhausting the administrative process."  Defendants' Response at 17.  Finally, the Defendants assert the "Plaintiff unduly delayed in attempting to amend his complaint to allege the claims under the Rehabilitation Act and the ADA."  Defendants' Response at 19.  In the Defendants' view, the Plaintiff delays in amending the Complaint, because the Plaintiff "had access to all of the facts necessary to bring these claims when he first filed this case,

in August 2022." Defendants' Response at 19. Moreover, according to the Defendants, the Plaintiff "has shown no reason for this delay." Defendants' Response at 19. Accordingly, the Defendants assert that "there is prejudice to the NMCD in defending against this claim," and the Plaintiff's Motion to Amend "should be denied as unduly delayed and prejudicial." Defendants' Response at 19.

### 4. The Plaintiff's Reply.

On June 27, 2025, the Plaintiff files the Plaintiff's Reply. See Plaintiff's Reply at 1. The Plaintiff's Reply addresses the Defendants' arguments about the conspiracy, the Rehabilitation Act, and the Ada. See Plaintiff's Reply at 3-11. First, the Plaintiff argues that he pleads sufficient facts against Angel Sanchez to meet the conspiracy's elements. See Plaintiff's Reply at 3-8. In the Plaintiff's view, he shows that Angel Sanchez and Andres Sanchez "acted in concert," and "that they had a meeting of minds, an agreement among them or that Angel Sanchez and Andres Sanchez had a general conspiratorial objective." Plaintiff's Reply at 4. The Plaintiff continues, furthermore, by stating that, even if there is not a "meeting of the minds" between Angel Sanchez and Andres Sanchez, he alleges "at the very least" facts to support "that there was a general conspiratorial objective between Angel Sanchez and Andress Sanchez." Plaintiff's Reply at 7. Regarding the Rehabilitation Act and the ADA, the Plaintiff summarizes the Defendant's arguments, concluding that the arguments "do not defeat plaintiff's position." Plaintiff's Reply at 10-11. Finally, regarding the undue delay argument, the Plaintiff asserts that the "newly discovered evidence proved by [Witness Two] and [Witness One] and the findings of this Court . . . , the argument of undue delay and prejudice are without merit." Plaintiff's Reply at 12.

### LAW REGARDING MOTIONS TO AMEND

"While Rule 15 governs amendments to pleadings generally, rule 16 of the Federal Rules of Civil Procedure governs amendments to scheduling orders." Bylin v. Billings, 568 F.3d 1224,

1231 (10th Cir. 2009)(citing Fed. R. Civ. P. 16(b)).  When a court has not entered a scheduling order in a particular case, rule 15 governs amendments to a plaintiff's complaint.  See Fed. R. Civ. P. 15.  When a scheduling order governs the case's pace, however, amending the complaint after the deadline for such amendments implicitly requires an amendment to the scheduling order, and rule 16(b)(4) governs changes to the scheduling order.  See Bylin v. Billings, 568 F.3d at 1231.

Rule 15(a) of the Federal Rules of Civil Procedure provides:

**(1)     Amending as a Matter of Course.**  A party may amend its pleading once as a matter of course within:

**(A)**     21 days after serving it, or
**(B)**     if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under rule 12(b), (e), or (f), whichever is earlier.

**(2)     Other Amendments.**  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a)(bold and italics in original).  Further, the local rules provide that, with respect to motions to amend a pleading, "[a] proposed amendment to a pleading must accompany the motion to amend."  D.N.M.LR-Civ. 15.1.

Under rule 15(a), the court freely should grant leave to amend a pleading where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. Russell, 2007 WL 709041, at *1-2 (D.N.M. 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Coop., 2005 WL 3664299, at *1-2 (D.N.M. 2005)(Browning, J.). The Supreme Court states that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . [,] repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," the federal court should give leave to amend freely.  Fomen v. Davis, 371

U.S. 178, 182 (1962).  See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001); In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a) where the proposed "amendment would be futile."  Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  An amendment is "futile" if the pleading, "as amended, would be subject to dismissal."  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court also may deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed."  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. West, Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993)).  See Youell v. Russell, 2007 WL 709041, at *2-3; Lymon v. Aramark Corp., 2009 WL 1299842 (D.N.M. 2009)(Browning, J.).  The Tenth Circuit also notes:

> It is well settled in this circuit that untimeliness alone is a sufficient reason to deny leave to amend, see Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452, 1462 (10th Cir. 1991); Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990); First City Bank v. Air Capitol Aircraft Sales, 820 F.2d 1127, 1133 (10th Cir. 1987), especially when the party filing the motion has no adequate explanation for the delay, Woolsey, 934 F.2d at 1462.  Furthermore, "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial."  Las Vegas Ice, 893 F.2d at 1185.

Frank v. U.S. West, Inc., 3 F.3d at 1365-66.[10]  The longer the delay, "the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court,

---

[10]There is older authority in the Tenth Circuit that contrary.  See R.E.B., Inc. v. Ralston Purina Co., 525 F.2d 749, 751 (10th Cir. 1975)("Lateness does not of itself justify the denial of the amendment.").  Minter v. Prime Equipment Co. seems to clarify that the distinction is between "delay" and "undue delay."  Minter v. Prime Equipment Co., 451 F.3d at 1205-06.  Delay is undue

is itself a sufficient reason for the court to withhold permission to amend." Minter v. Prime Equip. Co., 451 F.3d 1196, 1205 (10th Cir. 2006)(citing Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004)). Undue delay occurs where the plaintiff's amendments "make the complaint 'a moving target.'" Minter v. Prime Equip. Co., 451 F.3d at 1206 (quoting Viernow v. Euripides Dev. Corp., 157 F.3d 785, 799-800 (10th Cir. 1998)). "[P]rejudice to the opposing party need not also be shown." Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d at 1185. "Where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d at 1185 (quoting State Distribs., Inc. v. Glenmore Distilleries Co., 738 F.2d 405 (10th Cir. 1984)). The court also will deny amendment if the party learns of the facts upon which its proposed amendment is based and nevertheless unreasonably delays in moving to amend its complaint. See Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir. 1994)(noting that the motion to amend "was not based on new evidence unavailable at the time of the original filing").

The Court generally should refuse leave to amend only upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment. See Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1585 (10th Cir. 1993)(citing Foman v. Davis, 371 U.S. at 182). Again, the matter is left to the Court's discretion. See Frank v. U.S. West, Inc., 3 F.3d at 1365-66. See Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005)(quoting Frank v. U.S. West, Inc., 3 F.3d at 1365-66, and stating that resolving the issue whether to allow a

_____

"when the party filing the motion has no adequate explanation for the delay." Minter v. Prime Equipment Co., 451 F.3d at 1206.

plaintiff to file a supplement to his complaint is "well within the discretion of the district court"). "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" B.T. ex rel. G.T. v. Santa Fe Pub. Schs., 2007 WL 1306814, at *2 (D.N.M. 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d at 1204). "Specifically, the . . . Tenth Circuit has determined that district courts should grant leave to amend when doing so would yield a meritorious claim." Burleson v. ENMR-Plateau Tel. Co-op., 2005 WL 3664299, at *2 (D.N.M. 2005)(Browning, J.)(citing Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001)).

### LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(B)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). A court may also consider documents to which the complaint refers, if their adequacy is central to the plaintiffs' claims and their authenticity is unquestioned. See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the court properly considered notices attached to the motion and not to the complaint, because the complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned). See also GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)(Kelly, J.)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered . . . .").

A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those

allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff."  (quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).  At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face."  Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).  See Duncan v. Citibank (S.D.), N.A., No. CIV 06-0246 JB/KBM, 2006 WL 4063021, at *3 (D.N.M. June 30, 2006)(Browning, J.)(dismissing a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") cause of action from a complaint where the complaint alleged a single physical act, and not a pattern of racketeering activity, and a pattern of activity is one of the elements required to state a RICO claim).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v.

Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  A court will not construe a plaintiff's pleadings "so liberally that it becomes his advocate."  Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d at 1247 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).  See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d at 1125; Gossett v. Barnhart, 139 F. App'x at 25 ("In ruling on a motion to dismiss, the district court is limited to the facts pled in the complaint.").  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels states: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint.  The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."  91 F. App'x at 85.  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues &

Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d at 941; and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which contains time limitations that the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and

"because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment."  167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes the defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing.  See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness.  See 2013 WL 312881, at *50-51.  The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree").  The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action and as an exception to the general rule, the Court has concluded that the Court may consider a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, when ruling on the defendant's motion to dismiss without converting the motion

into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).  See also SEC v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, emails referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action, and it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute. See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create any substantive rights, but merely enforce[s] existing constitutional and federal statutory rights . . . .'" (quoting Ellis v. Univ. of Kansas Med. Ctr., 163 F.3d 1186, 1197 (10th Cir. 1998)(brackets in Nelson v. Geringer, but not in Ellis v. Univ. of Kansas Med. Ctr.)).  Section 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violates the claimant's federally protected rights.  To state a claim upon which relief can be granted

under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  The Court notes:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F.Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).

The Supreme Court of the United States clarified that, in alleging a § 1983 action against a government agent in his or her individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676.  Consequently, there is no respondeat superior liability under § 1983.  See Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens*[11] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 689 (1978).  Supervisors can be held liable only for their own unconstitutional or

---

[11]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)("Bivens"), the Supreme Court holds that a violation of the Fourth Amendment of the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389. Thus, in a Bivens action, a plaintiff may seek damages when a federal officer acting under the color of federal authority violates the plaintiff's Constitutional rights.  See Bivens, 403 U.S. at 389.  See also Ashcroft v. Iqbal, 556 U.S. at 675-76 (stating that Bivens actions are the "federal analog" to § 1983 actions).

illegal policies, and not for their employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit also recognizes that Ashcroft v. Iqbal limits, but does not eliminate, supervisory liability for government officials based on an employee's or subordinate's Constitutional violations.  See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)("Dodds")).  The language that may alter the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson states:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  The Tenth Circuit notes, however, that "*Iqbal* may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds, 614 F.3d at 1200.  It concludes that Ashcroft v. Iqbal does not alter "the Supreme Court's previously enunciated § 1983 causation

and personal involvement analysis." Dodds, 614 F.3d at 1200. More specifically, the Tenth Circuit recognizes that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)("Rizzo")).

The specific example that the Tenth Circuit uses to illustrate this principle is Rizzo v. Goode, where the plaintiff seeks to hold a mayor, a police commissioner, and other city officials liable under § 1983 for Constitutional violations that unnamed individual police officers commit. See Dodds, 614 F.3d at 1200 (referencing Rizzo, 423 U.S. at 371).  The Tenth Circuit notes that the Supreme Court in that case finds a sufficient link between the police misconduct and the city officials' conduct, because there is a deliberate plan by some of the named defendants to "'crush the nascent labor organizations.'" Dodds, 614 F.3d at 1200 (quoting Rizzo, 423 U.S. at 371).

### LAW REGARDING 42 U.S.C. § 1985

Claims under 42 U.S.C. § 1985 are less common than claims under § 1983. Section 1985 pertains to the prohibition of conspiracies which interfere with civil rights. See 42 U.S.C. § 1985. The Supreme Court recognizes "five broad classes of conspiratorial activity" that § 1985 prohibits. Kush v. Rutledge, 460 U.S. 719, 724 (1983).  "Three of the five broad categories . . . relate to institutions and processes of the Federal Government." Kush v. Rutledge, 460 U.S. at 724.  The fourth and fifth classes of § 1985 claims apply to conspiracies to "obstruct the course of justice in state courts," and to "go in disguise on the highway or in the premises of another." Kush v. Rutledge, 460 U.S. at 724 (internal quotation marks omitted). Both of these latter categories require an "intent to deprive their victims of the equal protections of the laws," which means that there must be some "'racial, or perhaps otherwise class-based, invidiously discriminatory animus' behind the conspiratorial action." Kush v. Rutledge, 460 U.S. at 724, 726 (quoting Griffin v.

Brekenridge, 403 U.S. 88, 102 (1971)).  See Campbell v. Amax Coal Co., 610 F.2d 701, 702 (10th Cir. 1979)("[I]n the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985.").

To succeed on a § 1985 claim, a plaintiff must prove a conspiracy. See Dixon v. City of Lawton, Okla., 898 F.2d 1443, 1447 (10th Cir. 1990).  To state a valid claim for conspiracy, "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants." Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 533 (10th Cir. 1998)(discussing conspiracy under § 1983).  "[M]ere conclusory allegations with no supporting factual averments are insufficient; the pleadings must specifically present facts tending to show agreement and concerted action." Sooner Prods. Co. v. McBride, 708 F.2d 510, 512 (10th Cir. 1983)(discussing conspiracy under § 1983).

The Tenth Circuit has held that it is error to "precondition consideration of a plaintiff's § 1985(3) claim upon the finding of § 1983 liability." Dixon v. City of Lawton, Okla., 898 F.2d at 1447 (10th Cir. 1990).

> Although neither § 1983 nor § 1985(3) create any substantive rights, a § 1983 claim generally describes a substantive violation of a right secured by the Constitution or laws, whereas a § 1985(3) claim generally describes a conspiracy of two or more persons for the purpose of depriving of another of equal protection of the laws or equal privileges and immunities under the laws.

Dixon v. City of Lawton, Okla., 898 F.2d at 1447.

To state a claim under § 1985(3), a plaintiff must show: (i) a conspiracy, motivated by racially discriminatory animus; (ii) to deprive the plaintiff of equal protection or equal protections of the laws; (iii) an act in furtherance of the conspiracy; and (iv) an injury or deprivation resulting therefrom.  See Paris v. Sw. Bell Tel. Co., 94 F. App'x 810, 815 (10th Cir. 2004)(unpublished); Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993).   "Conclusory allegations that the defendants acted in concert or conspired, without specific factual allegations

- 30 -

to support such assertions, are insufficient to state a claim under § 1985(3)." Martinez v. Martinez, 2010 U.S. Dist. LEXIS 38109, 2010 WL 1608884, at *12 (citing Merritt v. Hawk, 153 F. Supp. 2d 1216, 1225 (D. Colo. 2001)(Weinshienk, J.).

The Tenth Circuit has stated that § 1985(3) is intended "to provide redress for victims of conspiracies impelled by a commingling of racial and political motives." Brown v. Reardon, 770 F.2d 896, 907 (10th Cir. 1985). "[I]n the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985." Campbell v. Amax Coal Co., 610 F.2d at 702. The Tenth Circuit consistently has dismissed § 1985(3) claims devoid of racial, discriminatory animus. For example, in Paris v. Sw. Bell Tel. Co., the Tenth Circuit held that the plaintiff's hostile-work-environment claim failed, because she did not show racial discriminatory animus on the part of the alleged conspirators. See 94 F. App'x at 815.

In Martinez v. Martinez, the plaintiff alleged that M. Martinez, her ex-husband, Lynda Latta, her ex-husband's attorney, and the Honorable Elizabeth Whitefield, the judge who presided over the Martinezes' divorce in state court, conspired against her to deprive her of her rights guaranteed under the Equal Protection Clause. See 2010 U.S. Dist. LEXIS 38109, 2010 WL 1608884, at *1, *26. The Court noted:

The entirety of the constitutional claims appear to be these:

14. In the Court's Defendant 4's [i.e., Judge Whitefield's] ruling to dismiss this case against Plaintiff first of all is a violation of Federal Rule 60(b)(4) because the Court lacked jurisdiction over the subject matter and that dismissal, for lack of prosecution, which conduct was done as a state actor under color of law by [Judge Whitefield] and in conspiracy with [Ms. Latta] on behalf of [M. Martinez], to achieve these ends. [Ms. Latta] is included in this legal process, entered into knowingly and fraudulently to achieve the illegitimate end of depriving Plaintiff of her due civil rights by [Judge Whitefield's] void ruling, which rights are afforded by USC 42 §§ 1983 and 1985(3) to a fair hearing of the property as she has attempted to litigate for these last years.

15. [Ms. Latta and Judge Whitefield] are participants with [M. Martinez] and

- 31 -

have conspired to keep Plaintiff at bay in obtaining her rights to this undivided property by engaging improper courts and attempts to harass and exhaust Plaintiff of her financial resources . . . .

. . . .

17. The Fourteenth Amendment states thus: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law . . .   And further in the Fifth Amendment "the Bill of Rights protects against abuse of government -- the 'double jeopardy' clause seems to be applied here, because Plaintiff's same former case 95-2963 was voluntarily dismissed by Plaintiff without prejudice in 2003, and resurrected from the dead improperly by [M. Martinez, Ms. Latta, and Judge Whitefield] on August 28, 2007 by Motion.

18. [Judge Whitefield] attempts to adjudicate a new dismissal of this same closed case by dismissing it again against Plaintiff for lack of prosecution and  would attempt by doing so, to take away her right to adjudicate it elsewhere -- this would be a gross violation for Plaintiff from [Judge Whitefield] and finds into the double jeopardy type of thinking easily -- a double dismissal, one legitimate by Plaintiff and one illegitimate (reopened by Defendants by Motion) after this dismissal, and done (the second) with intention by [M. Martinez and Ms. Latta] and especially with the power of [Judge Whitefield], to attempt to deprive Plaintiff of her due process rights of hearing and eliminating her possibility to adjudicate her claim because [Judge Whitefield's] ruling would then be the second dismissal on the basis of lack of prosecution which then adjudicates a case and it could not be brought again by this Plaintiff.

Martinez v. Martinez, 2010 U.S. Dist. LEXIS 38109, 2010 WL 1608884, at **24-25 (alterations in opinion).   The Court dismissed the § 1985 claim, reasoning that the plaintiff "makes no allegation of discriminatory animus by [the defendants]" and that "there is nothing more than a conclusory allegation of conspiracy, lacking any underlying facts." 2010 U.S. Dist. LEXIS 38109, at *27.   The Court noted that "[n]o alleged facts touch on any individual's race, political or religious affiliation, or any other categorization against which the Defendants might hold a discriminate animus." 2010 U.S. Dist. LEXIS 38109, 2010 WL 1608884, at *27.

**LAW REGARDING QUALIFIED IMMUNITY**

Government officials performing "discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).

Section 1983 creates a cause of action for a plaintiff to seek money damages from State officials who have violated his or her constitutional or statutory rights. See 42 U.S.C. § 1983. Additionally, pursuant to Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388, 397 (1971)("Bivens"), a plaintiff may seek money damages from federal officials who have violated his or her constitutional rights.[12] The Supreme Court, however, deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). Officials may assert qualified immunity to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties." Anderson v.

---

[12]Bivens has been extended, however, to only a handful of constitutional rights. See Davis v. Passman, 442 U.S. 228, 248 (1979)(finding an implied cause of action for violations of the equal protection principles enmeshed within the due process clause of the Fifth Amendment to the United States Constitution, U.S. Const. amend V); Carlson v. Green, 446 U.S. 14 (1980)(extending Bivens to allow for damages for violations of the cruel-and-unusual punishment clause of the Eighth Amendment to the United States Constitution). The Supreme Court has expressed hesitation about federal courts extending Bivens into new contexts. See Hernandez v. Mesa, 589 U.S. 93, 113 (2020)("When evaluating whether to extend Bivens, the most important question 'is "who should decide" whether to provide for a damages remedy, Congress or the courts?' The correct 'answer most often will be Congress.'" (first quoting Ziglar v. Abbasi, 582 U.S. 120, 134 (2017); and then quoting Bush v. Lucas, 462 U.S. 367, 380 (1983))).

Creighton, 483 U.S. 635, 638, (1987).  See Green v. Padilla, 484 F. Supp. at 1129 (explaining that

qualified immunity protects government officials who perform discretionary functions if there is

no prior, well established case law which would have put them on fair notice of their potential

liability).

       If a government official has not violated a "clearly established" right, the official is shielded

from personal liability.  Harlow v. Fitzgerald, 575 U.S. 800, 818 (1982).  Qualified immunity

therefore "provides ample protection to all but the plainly incompetent or those who knowingly

violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  Qualified immunity protects officers

who have "reasonable, but mistaken beliefs" and operate at the sometimes "hazy border" of the

laws.  Saucier v. Katz, 533 U.S. 194, 205 (2001).  A court:

> can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior
> case law has not clearly settled the right, and so given officials fair notice of it, the
> court can simply dismiss the claim for money damages.  The court need never
> decide whether the plaintiff's claim, even though novel or otherwise unsettled, in
> fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).  A series of policy considerations guide the Tenth

Circuit's qualified-immunity analysis: "(1) protecting against 'unwarranted timidity on the part of

public officials;' (2) ensuring 'that talented candidates are not deterred by the threat of damages

suits from entering public service;' and (3) guarding against employees being distracted from their

duties." Estate of Jensen by Jensen v. Clyde, 989 F.3d 848, 856 (10th Cir. 2021)(citing Richardson

v. McKnight, 521 U.S. 399, 408 (1997)).

       Qualified immunity shields government officials from liability, therefore, when "their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v.

Fitzgerald, 457 U.S. at 818).  When a defendant asserts qualified immunity, it "creates a

presumption that they are immune from suit" and not a presumption that they are immune from liability.  Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016).  When a defendant asserts qualified immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her federal Constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct, such that "every reasonable officer would have understood" as much.  Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020).  See Riggins, 572 F.3d at 1107.  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.)(requiring that the plaintiff must demonstrate both prongs of the qualified immunity analysis to overcome a defendant's qualified immunity defense).

### 1.    The Procedural Approach to Qualified Immunity.

The Supreme Court has clarified the proper procedure for lower courts to evaluate a qualified immunity defense.  Before the Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court directed lower courts to decide, first, whether the facts alleged or shown by the plaintiff make out a Constitutional violation, and, if the plaintiff makes that showing, then decide whether the right at issue was clearly established at the time of the alleged violation.  See Saucier v. Katz, 533 U.S. 194, 200 (2001).  The Supreme Court's decision in Pearson v. Callahan, however, makes the so-called "Saucier two-step" advisory rather than mandatory, noting that Saucier v. Katz' "rigid order of battle" had faced criticism from lower courts on "practical, procedural, and substantive grounds."  Pearson v. Callahan, 555 U.S. at 234 (quoting Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1275, 1277 (2006)).  Although the Supreme Court recognizes that the Saucier rule is "beneficial" and "often appropriate," lower courts are now permitted to exercise their "sound discretion" when deciding "which of the two prongs of the qualified immunity analysis should be addressed first in

light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. at 236-37.

In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and Courts of Appeals with "what may seem to be an essentially academic exercise." Pearson v. Callahan, 555 U.S. at 237. The Supreme Court explains that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the 'older, wiser judicial counsel 'not to pass on questions of constitutionality unless such adjudication is unavoidable.''" Pearson v. Callahan, 555 U.S. at 241 (quoting Scott v. Harris, 550 U.S. at 388; then quoting Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 105 (1944)). See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[13] qualified immunity's clearly established prong: when (i) the first, Constitutional violation

---

[13]In Camreta v. Greene, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707. In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), then-Judge Gorsuch, writing for the Tenth Circuit, interprets Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d at 1180-81. The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the court should exercise its discretion carefully.

question "is so fact bound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the Constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decision making," because of inadequate briefing; (vi) discussing both elements risks "bad decision making," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the Constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first Constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the Constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context.  Camreta v. Greene, 563 U.S. at 706-707.  See Kerns v. Bader, 663 F.3d at 1181.[14]

---

[14]In Kerns v. Bader, the Tenth Circuit reverses the Court's decision that an officer is not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense does not protect the officer.  663 F.3d at 1183.  In reversing, then-Judge Gorsuch states:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit does not analyze whether the officer violates the plaintiff's constitutional rights and states that guidance on the particular Constitutional issue would be more appropriate in a case not involving qualified immunity:  "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court states:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment."  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that
>
> > [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983.  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials are not liable for Constitutional violations where they reasonably believe that their conduct is Constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified

Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would be appropriate only if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .   These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was

According to the Supreme Court, lower courts "should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[15]  See Camreta v. Greene, 563

inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).  It is odd to suggest that the deficit of constitutional law should occur in the sphere of a factually shaky judge-made exclusionary rule and discourage Constitutional law at the cost of a Congressionally passed statute.

[15]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a Constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.

The "Saucier two-step" encourages courts to articulate the Constitutional rights at issue. Before Pearson v. Callahan made the "Saucier two-step" discretionary, it faced criticism from numerous Supreme Court members.  Associate Justice Stephen Breyer writes, before Pearson v. Callahan, that he "would end the failed Saucier experiment now."  Morse v. Frederick, 551 U.S. 393, 432 (2007)(Breyer, J., concurring in the judgment and dissenting in part).  Joined by Associate

U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182.  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1082-83 (D.N.M. 2016)(Browning, J.).

2.    **Clearly Established Rights.**

A right is "clearly established" when it is "sufficiently clear that every reasonable official employee would have understood that what he is doing violates that right."  Mullenix v. Luna, 577 U.S. 7, 11 (2015)(quoting Reichle v. Howards, 566 U.S. at 664).  A clearly established right is

Justices Ruth Bader Ginsburg and Stephen Breyer, Associate Justice John Paul Stevens criticizes Saucier v. Katz, because it is an "unwise judge-made rule under which courts must decide whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity."  Bunting v. Mellen, 541 U.S. 1019, 1019 (2004).  Joined by Chief Justice of the United States William Rehnquist, Associate Justice of the United States Supreme Court Antonin Scalia writes: "We should either make clear that constitutional determinations are not insulated from our review . . . or else drop any pretense at requiring the ordering in every case."  Bunting v. Mellen, 541 U.S. at 1025 (Scalia, J., dissenting from the denial of certiorari)(emphasis in original).

Judicial resources are valuable and scarce, but they should not be conserved at the expense of protecting Constitutional rights.  In addition to being easier in practice, Saucier v. Katz also increases the frequency and depth with which courts articulate Constitutional law.  See Nancy Leong, The Saucier Qualified Immunity Experiment, An Empirical Analysis, 36 Pepp. L. Rev. 667 (2009).  Chief Justice Rehnquist opines that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public."  Wilson v. Layne, 526 U.S. 603, 609 (1999).  The evidence to support Chief Justice Rehnquist's assertion, however, is mixed.  See Paul W. Hughes, Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation of Constitutional Rights, 80 U. Colo. L. Rev. 401, 404 (2009)("[T]he proof of the pudding is in the eating; levels of constitutional articulation increased dramatically following the Court's development of the Wilson-Saucier sequencing doctrine.").  See also Leong, 36 Pepp. L. Rev. at 670 (finding that mandatory sequencing "leads to the articulation of more constitutional law, but not the expansion of constitutional rights"); Greg Sobolski & Matt Steinberg, Note, An Empirical Analysis of Section 1983 Qualified Immunity Actions and Implications of Pearson v. Callahan, 62 Stan. L. Rev. 523 (2010).  The bottom line is that a trial court often -- if not frequently -- needs to decide whether the Constitutional right is violated before deciding if it is clearly established.

"generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colorado Dep't of Corr., No. 10-1396, 429 F. App'x 707, 710 (10th Cir. 2011)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in Holland ex rel. Overdorff v. Harrington, but not in Saucier v. Katz)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004). In other words, existing precedent must have placed the constitutional or statutory question "beyond debate." Ashcroft v. al-Kidd, 563 U.S. at 741.

The Supreme Court requires that courts not define the constitutional right at issue "'at a high level of generality.'" White v. Pauly, 580 U.S. 73, 79 (2017)(quoting Ashcroft v. al-Kidd, 563 U.S. at 742). The Supreme Court refers to this principle as a "longstanding principle." White v. Pauly, 580 U.S. at 79. Nevertheless, the clearly established law must be "particularized" to the case's facts. Anderson v. Creighton, 483 U.S. at 640. If the clearly established law at issue is not sufficiently particularized, the "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson v. Creighton, 483 U.S. at 639. "[G]eneral statements of the law" are not "inherently incapable" of clearly establishing a right, because they can sometimes give "fair and clear warning" to officers. United States v. Lanier, 520 U.S. 259, 271 (2017). See White v. Pauly, 580 U.S. at 79 (reiterating this principle). Importantly, the "unlawfulness must be apparent."

Anderson v. Creighton, 483 U.S. at 640.  See Brosseau v. Haugen, 543 U.S. 194, 199 (2004)("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.")(citing Hope v. Pelzer, 536 U.S. 730, 738 (2002)(noting that, in a case where the Eighth Amendment violation is "obvious," there need not be a materially similar case for the right to be clearly established)).  A court therefore must "inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances."  City of Escondido v. Emmons, 586 U.S. 38, 42 (2019).

In the Tenth Circuit, until recently, this rule meant that a right is clearly established only when there is a factually similar "Supreme Court or Tenth Circuit decision on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains."  Truman v. Orem City, 1 F. 4th 1227, 1235 (10th Cir. 2021)(quoting Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014)).  Although a plaintiff asserting a violation of a clearly established right must in most circumstances point to a case that is sufficiently factually similar, the Supreme Court recently has stated that this closeness is not always required.  See Taylor v. Riojas, 592 U.S. 7, 9 (2020)("Taylor").  The Supreme Court, in a short per curiam opinion, suggests an objective, "no reasonable correctional officer" standard when it holds that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time."  Taylor, 592 U.S. at 8.  In Taylor, corrections officers house an inmate in "shockingly unsanitary cells."  592 U.S. at 8.  One cell is covered "nearly floor to ceiling, in 'massive mounts' of feces: all over the floor, the ceiling, the window, the walls, and even 'packed inside the water faucet.'"  Taylor, 592 U.S. at 8 (quoting Taylor v. Stevens, 946 F.3d 211, 218 (5th Cir. 2019)).  Correctional officers confine the plaintiff in this cell for four days, but the plaintiff does not eat or drink, because he fears that his food and water are contaminated.  See 592 U.S. at

8.  Correctional officers then move the plaintiff to a second cell that is "frigidly cold" and is equipped with "only a clogged drain in the floor to dispose of bodily wastes."  592 U.S. at 8.  The plaintiff holds his bladder for more than twenty-four hours before finally involuntarily relieving himself, which causes the clogged drain to overflow and "raw sewage to spill across the floor."  592 U.S. at 8.  Because the plaintiff is not provided a bed and is confined without clothes, the plaintiff is "left to sleep naked in sewage."  Taylor, 592 U.S. at 8.

The United States Court of Appeals for the Fifth Circuit holds that these confinement conditions violated the Eighth Amendment's ban on cruel-and-unusual punishment, but it grants the corrections officers qualified immunity because the law was not clearly established.  See Taylor, 592 U.S. at 8 (citing Taylor v. Stevens, 946 F.3d at 222).  The Fifth Circuit concludes that the corrections officials did not have "fair warning" that confining the plaintiff in these conditions would be unconstitutional.  Taylor v. Stevens, 946 F.3d at 222 (quoting Hope v. Pelzer, 536 U.S. at 741).  The Supreme Court reverses, holding that the Fifth Circuit errs when it grants qualified immunity on this basis.  See Taylor, 592 U.S. at 9.  Although the plaintiff could not identify a case on point, the Supreme Court notes that -- even in the absence of a case clearly establishing the law -- "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time."  Taylor, 592 U.S. at 8.  See Truman v. Orem City, 1 F. 4th at 1240 (summarizing the Supreme Court's conclusion and stating that the Supreme Court "made clear that [the plaintiff] did not have to" identify a case on point).

For decades, lower courts have tried diligently and faithfully to follow the unwritten signals of superior courts.[16]  One such unwritten signal is, or at least was, that "a nigh identical case must

---

[16]As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, notes, much of what lower courts do is read the implicit, unwritten signs that the

exist for the law to be clearly established." Caldwell, 510 F.Supp. 3d at 1031 n.14.[17]  As numerous

Courts of Appeals have recently noted, however, Taylor clarifies that it is no longer the case that

---

superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).

[17]The Court notes, as it has elsewhere, see, e.g., Caldwell, 510 F.Supp.3d at 1031 n.14, that qualified immunity is a problematic doctrine.  This problem is particularly true of the Supreme Court's approach before Taylor.  "Factually identical or highly similar factual cases are not . . . the way the real world works."  Caldwell, 510 F.Supp.3d at 1031 n.14.

Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?"  Thus, when the Supreme Court grounds its clearly established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 584 U.S. 100, 105 (2018), yet still requires a highly factually analogous case, it either has lost sight of reasonable officer's experience or is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 584 U.S. at 121 (Sotomayor, J. dissenting). The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to eliminate effectively § 1983 claims against State actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

In most circumstances, a prior plaintiff must have been subjected to almost identical treatment, and a court must have found that law to have been clearly established for a subsequent plaintiff to get around the obstacle that qualified immunity creates.  See Stephen R. Reinhardt, The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences, 113 Mich. L. Rev. 1219, 1245 (2015)("[T]he Court has through qualified immunity created such powerful shields for law enforcement that people whose rights are violated, even in egregious ways, often lack any means of enforcing rights.").  See also White v. Pauly, 580 U.S. at 79 (criticizing the Tenth Circuit below, because it "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth

Amendment).  In most of those situations, officials can escape liability for violating someone's statutory or constitutional rights, because a prior court has not addressed the issue.  As United States Circuit Judge for the Court of Appeals for the Fifth Circuit Don Willett notes, this situation creates a Catch-22.  See Zadeh v. Robinson, 902 F.3d 483, 499 (5th Cir. 2018)(Willett, J. concurring in part and dissenting in part)(opinion withdrawn on rehearing).  The plaintiffs "must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because those questions are yet unanswered. Courts then rely on that judicial silence to conclude there's no equivalent case on the books." Zadeh v. Robinson, 902 F.3d at 499.  In short, "[n]o precedent = no clearly established law = no liability.  An Escherian Stairwell.  Heads defendants win, tails plaintiffs lose." Zadeh v. Robinson, 902 F.3d at 499.

The Court disagrees with the Supreme Court's approach.  The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the Congressionally enacted § 1983 remedy.  As the Cato Institute notes in an amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2 (U.S. Supreme Court, filed March 2, 2018)("Cato Brief").  "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2.  "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2.  See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect).  Further, as Justice Clarence Thomas has argued, because the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in 'interpret[ing] the intent of Congress in enacting' the Act." Ziglar v. Abbasi, 582 U.S. 120, 158 (2017)(Thomas, J., concurring)(quoting Malley v. Briggs, 475 U.S. 335, 342 (1986)).  "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." Ziglar v. Abbasi, 582 U.S. at 159-60 (Thomas, J., concurring)(quoting Rehberg v. Paulk, 566 U.S. 536, 363 (2012)).  The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a Constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive.  If the citizens of New Mexico decide that State actors use excessive force or deliberately are indifferent, the verdict should stand, and not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision.  Finally, always to decide the clearly established prong first and then always to say that the law is not clearly established could be stunting the development of Constitutional law.  See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015).  And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g, Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba v. Pickens, 844 F.3d 870, 874 (10th Cir. 2016); Rife v. Jefferson, No. 17-7037 ,

an almost-identical case must exist.  See Truman v. Orem City, 1 F. 4th at 1241 ("Just like any reasonable corrections officer should have understood the inmate in Taylor's conditions . . . offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."); Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)(explaining that the Supreme Court holds in Taylor that "there does not need to be a case directly on point" when no reasonable officer could conclude that the challenged action is constitutional); Taylor v. Ways, 999 F.3d 478, 492 (7th Cir. June 2, 2021)(noting that Taylor reaffirms that "the Supreme Court does not demand a case directly on point"); Roque v. Harvel, 993 F.3d 325, 335 (5th Cir. 2021)(citing Taylor for the proposition that, "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant case law" (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004))).  See also Joanna C. Schwartz, Qualified Immunity and Federalism All the Way Down, 109 Geo. L.J. 305, 351 (2020)("The Court's decision in Taylor sends the signal to the lower courts that they can deny qualified immunity without a prior case on point."); Lawrence Rosenthal, Defending Qualified Immunity, 72 S.C.L. Rev. 547, 593 & n.193 (2020)("More recently, however, the Court has stressed that on egregious facts, qualified immunity should be denied regardless whether there are factually similar precedents.").

742 F. App'x 377 (10th Cir. 2018); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, No. 16-2222, 707 F. App'x. 552 (10th Cir. 2017); Brown v. City of Colo. Springs, No. 16-1206, 709 F. App'x. 906, 909 (10th Cir. 2017), and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

There are, therefore, two possible interpretations of Taylor.  First, Taylor could be clarifying that the holding in Hope v. Pelzer, 536 U.S. at 741 -- that identifying an earlier case with "'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established," but that it is "not necessary to such a finding" -- is still good law even though it has fallen out of favor among lower courts.  This reading of Taylor would mean there is a narrow exception to the standard requirement that a plaintiff identify an earlier case on point that applies in cases only with "extreme circumstances" or "particularly egregious" facts.  Second, Taylor could mean that a court now must ask whether the conduct is particularly egregious such that no reasonable officer could have concluded that their actions are Constitutional, and, if the conduct is egregious, then there does not need to be a case clearly establishing the law.

Most Courts of Appeals have adopted the second interpretation.  Nonetheless, there is confusion both between and within the Courts of Appeals about Taylor's scope.[18]  Since Taylor,

---

[18]Cases from the United States Court of Appeals for the Ninth Circuit illustrate the confusion within the Courts of Appeals about Taylor's scope.  Compare, for example, O'Doan v. Sanford, 991 F.3d 1027 (9th Cir. March 19, 2021), with Rico v. Ducart, 980 F.3d 1293 (9th Cir. 2020)(Silver, J., concurring in part and dissenting in part).  O'Doan v. Sanford noted that for law to be clearly established, "the right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates the right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  991 F.3d at 1036-37 (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).  The Ninth Circuit points to the importance of factually analogous precedential cases, stating that: "the Supreme Court has reminded lower courts that "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."  O'Doan v. Sanford, 991 F.3d at (first citing Kisela v. Hughes, 584 U.S. at 104; then quoting Mullenix v. Luna, 577, U.S. 7, 13 (2015)(per curiam)).  The Ninth Circuit concludes that the plaintiff has not identified any precedent case law that has clearly established a right and emphasizes the importance of specificity over general or categorical statements of Constitutional violations in qualified immunity cases.  See O'Doan v. Sanford, 991 F.3d at 1044 (describing limits applying to the obviousness principle and distinguishing O'Doan from Taylor because of situational ambiguity.)  Finally, the Ninth Circuit reiterates that "the obviousness principle [is] an exception to the specific-case requirement [and] is especially problematic in the Fourth Amendment context."  O'Doan v. Sanford, 991 F.3d at 1044 (quoting Sharp v. County of Orange, 871 F.3d 901, 912 (9th Cir. 2017)).

courts have asked not just whether the law was clearly established through a factually similar case from that Court of Appeals or from the Supreme Court, but also whether the conduct at issue was "particularly egregious" such that "no reasonable correctional officer could have concluded that" their actions were constitutionally permissible. Taylor, 592 U.S. at 8. See Truman v. Orem City, 1 F. 4th at 1240. In other words, in addition to asking whether the officer is theoretically on notice that they are acting unlawfully,[19] the court also must ask whether the conduct at issue is

_____

On the other hand, the Honorable Judge Leslie E. Silver's concurrence in Rico v. Ducart, 980 F.3d at 1305, restates that the second prong of qualified immunity asks whether a reasonable official would have known that his or her actions were unconstitutional. See Rico v. Ducart, 980 F.3d at 1305. Judge Silver then notes that requiring plaintiffs to show exceedingly specific and existing case law that addresses the alleged misconduct's lawfulness, narrows the second prong in a way that the Supreme Court rejects in Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). See Rico v. Ducart, 980 F.3d at 1306 (explaining that determining whether there is precedent addressing "the lawfulness of creating noise while conducting court-ordered suicide-prevention welfare checks in a maximum-security facility built of concrete, metal, and steel" is functionally equivalent to necessitating a case on point). The concurrence's crux is that, while specificity is necessary when considering a case's context and the alleged violative conduct, courts should not require unreasonable specificity when obvious issues such as "basic and clearly necessary requirements" arise in the context of qualified immunity. See Rico v. Ducart, 980 F.3d at 1306. (stating that "[b]asic and clearly necessary requirements, such as sleep" are established beyond debate both because a reasonable official would know that depriving an inmate of sleep obviously violates an inmate's rights and because "[t]he right to adequate sleep, a well-recognized human need, is also established by persuasive authority").

[19]The Court notes that one of the most basic premises of the law of qualified immunity -- that an officer is aware either actually or potentially that his or her conduct is unlawful because the officer knows the holdings of both watershed Constitutional decisions and the lower court decisions that apply them -- does not hold up to empirical scrutiny. See Joanna C. Schwartz, Qualified Immunity's Boldest Lie, 88 U. Chi. L. Rev. 605, 610 (2021)(finding that, although police departments regularly inform officers about "watershed" decisions, officers are "not regularly informed about court decisions interpreting those decisions in different factual scenarios -- the very types of decisions that are necessary to clearly establish the law about the constitutionality of uses of force"). The Court previously has noted:

It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything

"particularly egregious" -- an objective question.  McCoy v. Alamu, 141 S. Ct. 1364, 1364 (2021)(vacating and remanding in light of Taylor even though the conduct at issue was likely not "particularly egregious").[20]

The United States Court of Appeals for the Third Circuit, for example, notes that Taylor does not affect whether three State legislators who took a public stand against the sale of State-owned property and then tried to pass a law divesting the State's ability to sell it are entitled to qualified immunity, because the legislators' actions are "not so outrageous that 'no reasonable . . . officer could have concluded' they were permissible under the Constitution."  HIRA Educ. Servs. N. Am. v. Augustine, 991 F.3d 180, 191 n.7 (3d Cir. 2021)(quoting Taylor, 592 U.S. at 8).  The United States Court of Appeals for the Seventh Circuit, too, concludes that Taylor means an officer

---

like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).

Manzanares v. Roosevelt Cnty. Adult Detention Center, 331 F. Supp.3d 1260, 1294 n.10 (D.N.M. 2018)(Browning, J.).

[20]Professor Colin Miller of the University of South Carolina School of Law notes that there are only two likely interpretations of the Supreme Court's summary disposition of McCoy v. Alamu: (i) that the Supreme Court remands so that the Fifth Circuit could consider whether the case involves "extreme circumstances" or "particularly egregious facts" like those in Taylor; and (ii) that the Supreme Court remands so that the Fifth Circuit can reconsider without looking for analogous prior precedent and instead "determine whether any reasonable officer should have realized" that the conduct violated the plaintiff's constitutional rights.  Colin Miller, The End of Comparative Qualified Immunity, 99 Texas. L. Rev. Online 217, 224 (2021)("Miller, The End of Comparative Qualified Immunity").  Miller argues that this second interpretation is more likely to be correct, because it "would be difficult to characterize" the officer's conduct as "'particularly egregious' without making a similar finding about most other unconstitutional behavior by government officers who seek qualified immunity."  Miller, The End of Comparative Qualified Immunity, at 224 (no citation for quotation).

is not entitled to qualified immunity if his or her conduct was "particularly egregious." Lopez v. Sheriff of Cook Cnty., 993 F.3d 981, 991 (7th Cir. 2021). In Lopez v. Sheriff of Cook County, the Seventh Circuit holds that an off-duty correctional officer who shoots and then uses as a human shield a man who fires his gun into the air near a crowd after a scuffle does not act "so egregious[ly] that any reasonable officer would know they [are] violating the Constitution notwithstanding the lack of an analogous decision."[21]  993 F.3d at 991. The United States Court of Appeals for the Ninth Circuit also distinguishes Taylor on the basis of the conduct's severity. See Rico v. Ducart, 980 F.3d 1292, 1300 n.9 (9th Cir. 2020). In Rico v. Ducart, the Ninth Circuit holds that correctional officers who perform inmate-welfare checks that, because of the design of the prison, creates loud noises every forty-five minutes are entitled to qualified immunity, because the facts are not "as

---

[21]The Court does not agree with the Seventh Circuit's conclusion. An off-duty officer using someone he has just shot multiple times as a human shield to "ward off" someone else with a gun -- the individual the officers uses as a human shield had moments earlier fired a gun into the air near a crowd -- is particularly egregious such that any reasonable officer should have realized that it violates someone's constitutional rights. Lopez v. Sheriff of Cook Cnty., 993 F.3d 992. Even if the officer is trying to protect himself and the public, firing a gun near a crowd does not justify being used as a flesh shield to protect an off-duty officer who shoots that shield moments earlier. Numerous provisions of international law and the laws of war, see, e.g., Rome Statute of the International Criminal Court, art. 8(2)(b)(xxiii)(July 17, 1998)(including in the definition of "war crimes" "[u]tilizing the presence of a civilian or other protected person to render certain points, areas or military forces immune from military operations"), prohibit such conduct. A police officer need not be familiar with international law to know that such conduct is improper, nor should someone else have been used as a human shield previously and a Court of Appeals concluded that conduct to have violated clearly established law for a subsequent human shield to overcome the burden of qualified immunity. The Seventh Circuit holds that the situation is "too fast-moving, too unpredictable, and too volatile" for an officer to know that using as a human shield the person he has just shot multiple times is a violation that is "so egregious that any reasonable officer would know they are violating the Constitution notwithstanding the lack of an analogous decision." 993 F.3d at 992. Instead, the Seventh Circuit appears to require the officer theoretically to be on notice that this conduct is a law violation because a prior officer must have done the same thing and an earlier court -- most likely the Seventh Circuit itself -- must have found that the use of human shields violates some clearly established law. If human shields are banned in war, they should not be allowed on the Chicago's streets. Any reasonable officer should know this conduct is not acceptable conduct under the Constitution.

- 51 -

extreme as those present in" Taylor.  980 F.3d at 1300 n.9.  Similarly, the Ninth Circuit also has decided that Taylor "only highlights the level of blatantly unconstitutional conduct necessary to satisfy the obviousness principles."  O'Doan v. Sanford, 991 F.3d at 1044 (9th Cir. 2021).

The other Courts of Appeals, however, have characterized Taylor as only reaffirming an "extreme-circumstances" or "obvious-clarity" exception.  The Fifth Circuit, for example, has distinguished Taylor, noting that it "involved a factually distinct claim involving unsanitary prison conditions," so it does not apply to a case about mental healthcare in prison.  Landry v. Laborde-Lahoz, 852 Fed. App'x 123, at *129 (5th Cir. Apr. 19, 2021).[22]  The Fifth Circuit, however, like other Courts of Appeals, has not adopted a consistent approach to Taylor.  The Fifth Circuit also notes that "it would have been 'obvious' to a reasonable officer that" several officers using their body weight to apply pressure to an unarmed man who does not resist arrest while the man is in the "maximal-restraint" position for five-and-a-half minutes so that the man stops breathing and his lips turn blue -- while officers nearby "milled around"-- constitutes "such a severe tactic against this particular person would be constitutionally proscribed," and that the officer would "have no recourse to qualified immunity."  Aguirre v. City of San Antonio, 995 F.3d 395, 403-04, 424 (5th Cir. 2020)(Jolly, J., concurring).  The Fifth Circuit further cites Taylor to support its assertion that, "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant law.'"  Roque v. Harvel, 993 F.3d 325, 335 (5th Cir. 2021)(quoting Brousseau v. Haugen, 542 U.S. 194, 199 (2004)).  In Roque v. Harvel, however, the Fifth Circuit does not say what those

---

[22]The Court does not agree with the Fifth Circuit's reasoning on this point, although it does not disagree with the case's result.  The Fifth Circuit reasons that Taylor does not support the plaintiff's argument that County officials acted with deliberate indifference in violation of the Eighth Amendment, because it is "factually distinct."  Landry v. Laborde-Lahoz, No. 20-20365, 852 F. App'x. at 129.  That Taylor is factually distinct has no bearing on the merits of a deliberate-indifference claim, but impacts its applicability to the qualified immunity question.

"general standards" might be, from where they might come, or where a court might look for them, and then proceeds to characterize qualified immunity law as requiring a case on point in almost all circumstances. 993 F.3d at 335.[23] More recently, however, the Fifth Circuit acknowledges that Taylor excuses a plaintiff from "their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'" Cope v. Cogdill, 3 F.4th 198, 206 (5th Cir. 2021)(quoting Taylor, 592 U.S. at 8). The Fifth Circuit stresses, however, that this hurdle is a "high standard," because the facts must be "'particularly egregious.'" Cope v. Cogdill, 3 F.4th at 206 (quoting Taylor, 592 U.S. at 9).

Most relevant here, the Tenth Circuit also has not given Taylor consistent treatment. For example, the Tenth Circuit treats Taylor as an example of the rule of United States v. Lanier, 520 U.S. 259 (1997), that a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful," if it gives "fair and clear warning" that the conduct violates the plaintiff's constitutional rights. United States v. Lanier, 520 U.S. at 271. See Routt v. Howry, No. 19-6187, 835 F. App'x. 379, 382 (10th Cir. 2020). This treatment of Taylor

---

[23]The Fifth Circuit's treatment of Taylor and the clearly established analysis is not consistent. In Tucker v. City of Shreveport, 998 F.3d 165 (5th Cir. 2021), the Fifth Circuit does not cite Taylor, but writes that "'[q]ualified immunity is justified unless no reasonable officer could have acted as [the defendant officers] did here, or every reasonable officer faced with the same facts would not have [acted as the defendant officers did].'" (quoting Mason v. Faul, 929 F.3d 752, 764 (5th Cir. 2019, cert. denied, 141 S. Ct. 116, 207 (2020)(citing District of Columbia v. Wesby, 583 U.S. 48, 63 (2018). Tucker v. City of Shreveport, 998 F.3d at 176-77. The Fifth Circuit's analysis in Tucker v. City of Shreveport confuses the reasonableness of the officers' behavior with the clarity of the precedent that clearly establishes the law. See 998 F.3d 165. As Taylor suggests, an officer can act particularly egregiously and not be entitled to qualified immunity even if no precedent clearly establishes the law. See Ramirez v. Guadarrama, 2 F.4th 506, 523 (5th Cir. 2021)(mem.)(Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [in McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts.").

asks about the relationship between a "general constitutional rule <u>already identified</u> in the decisional law" and the "conduct in question," and asks whether that rule applies with "obvious clarity." <u>United States v. Lanier</u>, 520 U.S. at 271 (emphasis added). Elsewhere, the Tenth Circuit states: "It suffices that 'the alleged unlawfulness [is] apparent in light of preexisting law.' That is, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'" <u>Huff v. Reeves</u>, 996 F.3d 1082, 1088 (10th Cir. 2021)(quoting <u>Riggins</u>, 572 F.3d at 1101; and <u>Taylor</u>, 592 U.S. at 9).

In <u>Frasier v. Evans</u>, 992 F.3d 1003, 1015 (10th Cir. 2021), however, the Tenth Circuit writes that "under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful." <u>Frasier v. Evans</u>, 992 F.3d at 1015 (quoting <u>Taylor</u>, 592 U.S. at 9). The Tenth Circuit continues by noting that the situation before it -- several police officers surround a man who asks one of the officers for a statement about the force the officer has just used on a "uncooperative suspect," and then one of the officers grabs the tablet and searches it for a video of the encounter -- is "not such a rare case" as <u>Taylor</u> or <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002). <u>Frasier v. Evans</u>, 992 F.3d at 1021-22. In other words, rather than having to point to an existing case with sufficiently analogous facts, a plaintiff instead can defeat an assertion of qualified immunity by meeting <u>Taylor</u>'s "extreme circumstances" or "particularly egregious" standard. <u>Frasier v. Evans</u>, 992 F.3d at 1015.

More recently, the Tenth Circuit holds that, even without a prior precedent clearly establishing the law, it is "obvious" that a prosecutor providing materially false information to a medical examiner that influences his expert opinion whether a homicide occurred -- and then putting that medical examiner on the stand to testify about that false information -- is "obviously egregious." <u>Truman v. Orem City</u>, 1 F. 4th at 1240 (first quoting <u>District of Columbia v. Wesby</u>,

583 U.S. 48, 63 (2018); and then quoting Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004)). The Tenth Circuit, in Truman v. Orem City, comparing the facts in that case directly to those in Taylor, continues: "Just like any reasonable correctional officer should understand the inmate in Taylor's conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution." 1 F. 4th at 1240. In reaching its conclusion in Truman v. Orem City, the Tenth Circuit reiterates that its qualified immunity analysis is "'not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law.'" Truman v. Orem City, 1 F. 4th at 1235 (quoting Reavis v. Frost, 967 F.3d 978, 992 (10th Cir. 2020)). Because the Tenth Circuit concludes that "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer was clearly established at the time of the prosecutor's conduct," 1 F. 4th at 1236, it determines that the plaintiff had alleged plausibly a fabrication-of-evidence claim against the prosecutor, 1 F. 4th at 1237. This treatment of Taylor does not ask only about the relationship between a "general constitutional rule already identified in the decisional law" and whether it applies with "obvious clarity" to the conduct, Routt v. Howry, 835 F. App'x at 382 (quoting United States v. Lanier, 520 U.S. at 271), but instead focuses on the objective "particularly egregious" standard, which applies even without any general Constitutional principles that courts have promulgated already, because "no reasonable [] officer" could have concluded the conduct to be lawful, Taylor, 592 U.S. at 8.

The Court does its best to follow diligently and faithfully the unwritten signals of superior courts, but, here, the signals are not clear.[24] The Court therefore will proceed with both lines of

---

[24]The Court agrees with the Tenth Circuit's treatment of Taylor in Truman v. Orem City, 1 F.4th 1227, that Taylor marginally expands the standard in United States v. Lanier, and in Hope v.

analysis.  An officer is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her federal Constitutional or statutory rights; and (ii) that the right was clearly established either (a) by a factually similar Supreme Court or Tenth Circuit case on point, see Thomas v. Kaven, 765 F.3d 1183, at 1194, or, in rare cases, by "general constitutional principles," Routt v. Howry, 835 F. App'x. at 382 -- at the time of the alleged misconduct, or (b) because the conduct was "particularly egregious" such that "any reasonable officer should have realized" it was unlawful, Taylor, 141 S. Ct. at 54.  See Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020); Riggins, 572 F.3d at 1107 ("When a defendant asserts qualified immunity at summary judgment . . .  the plaintiff [must] . . . demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity."); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1079.

The Court has applied previously the "particularly egregious" standard to cases concerning sexual assault in prison.  See Ortiz v. New Mexico, 550 F.Supp.3d 1020, 1175 (D.N.M. 2021)(Browning, J.).  In Ortiz v. New Mexico, the Court concludes that any reasonable

---

Pelzer, and stands for  the proposition that an officer is not entitled to qualified immunity when his or her conduct is "particularly egregious" such that "any reasonable [] officer should have realized" that his or her conduct offends the Constitution.  Taylor, 592 U.S. at 8.  See Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)("[W]hen 'no reasonable correctional officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." (quoting Taylor, 592 U.S. at 8)).  The Court concludes this treatment to be correct, especially in light of the Supreme Court's summary disposition in McCoy v. Alamu, 141 S. Ct. 1364, 1364 (mem)(2021).  See Ramirez v. Guadarrama, 2 F.4th at 523-24 (Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [in McCoy v. Alamu] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts."); Miller, The End of Comparative Qualified Immunity, at 222-23.  On the other hand, given the Court's view on qualified immunity, the Court hopes that the lower courts make this new hole in the qualified immunity defense so wide that the nation can run a truck through it.

correctional officer should understand that sexually assaulting an inmate or "knowingly allowing [the sexual assault] to happen despite being aware that it was prohibited by State law and prison policy . . . 'offends the Constitution.'" 550 F. Supp. at 1175 (quoting Truman v. Orem City, 1 F.4th at 1240). The behavior that the correctional officer exhibited is particularly egregious, because any reasonable officer would conclude that they are violating the Constitution. See Ortiz v. New Mexico, 550 F. Supp. 3d at 1175 (citing Taylor, 592 U.S. at 8). Under the "particularly egregious" standard, the Court concludes that the correctional officers are not entitled to qualified immunity. See Ortiz v. New Mexico, 550 F. Supp. 3d at 1175. The Court has applied the "particularly egregious" standard to several other cases as well. See Howes v. New Mexico Dept. of Health, No. CIV 21-0256, 2023 WL. 1419832, at *78 (D.N.M. Jan. 31, 2023)(Browning, J.)(concluding that a doctor's allegations of violations of his liberty interest in his reputation were not "particularly egregious" such that a reasonable officer would have realized the conduct was unlawful); Copar Pumice Co., Inc. v. Morris, No. CIV 07-79, 2008 WL 2323488, at *28 (D.N.M. 2008)(Browning, J.)(concluding that an official's conduct is not objectively reasonable if he or she enforces an ordinance in a "particularly egregious manner or in a manner which a reasonable officer would recognize exceed the bounds of the ordinance" (quoting Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 846-47 (2005)).

## ANALYSIS

The Court grants in part the Second Motion to Amend, as to the Plaintiff's § 1983 claims, where the Plaintiff provides new factual support for his claims not present when the Court previously dismisses the FAC, because the Court finds the new factual support troubling and justice requires the amendment as to Count I, Count II, and Count III against Angel Sanchez and Andres Sanchez. The Court denies in part the Second Motion to Amend, as to Count IV, because the Plaintiff does not state a claim that the grievance process discriminates against him because of

his disability. The Court will not seal the matter, but masks the identities of the Plaintiff, Witness One, and Witness Two, where their identities are publicly available in a separate action, because proceeding without masking them here poses a risk of harm that outweighs the public's interest in fully open proceedings. Finally, the Court grants the Plaintiff's request to extend the number of pages and exhibits, where the Plaintiff's motion exceeds the page limit by thirty-two pages, because the Defendants do not oppose this request.

I.     **THE COURT ALLOWS THE PROPOSED § 1983 AMENDMENT, BECAUSE THE COMPLAINT PLAUSIBLY ALLEGES A CONSPIRACY INVOLVING ANGEL <u>SANCHEZ</u>.**

The Defendants oppose all amendments to the FAC regarding Angel Sanchez, on futility grounds. See Defendants' Response at 2. They acknowledge that rule 15(a) states that "leave to amend should be freely given 'when justice so requires.'" Defendants' Response at 5 (quoting Fed. R. Civ. P. 15(a)(2)). Acknowledging this rule, however, the Defendants contend that the Court should not grant the Second Motion to Amend, because the claims against Angel Sanchez do not survive a motion to dismiss, making them futile. See Defendants' Response at 2. According to the Defendants, the Court should dismiss the claims against Angel Sanchez because: (i) there are insufficient facts showing a "meeting of the minds between Angel and Andres Sanchez," Defendants' Response at 10; and (ii) the Plaintiff does not plead Angel Sanchez "took any action to label him a snitch or put him in a danger from the inmate," making qualified immunity appropriate. Defendants' Response at 11. The Court addresses each argument in turn before considering the distinctions between § 1983 and § 1985 conspiracy claims.

A.     **THE PLAINTIFF PLAUSIBLY ALLEGES THAT ANGEL SANCHEZ HAS A § 1983 CONSPIRATORIAL OBJECTIVE.**

Section 1983 requires a plaintiff to plead the elements of a civil conspiracy, which include "'at least a combination of two or more persons acting in concert and an allegation of a meeting of

the minds, an agreement among the defendants, or a general conspiratorial objective.'"  Frasier v.

Evans, 992 F.3d 1003, 1024 (10th Cir. 2021)("Frasier")(quoting Brooks v. Gaenzle, 614 F.3d 1213,

1227-28 (10th Cir. 2010)).  The Tenth Circuit elaborates on the nature of such claims:

> A plaintiff seeking redress need not prove that each participant in a conspiracy knew the "exact limits of the illegal plan or the identity of all the participants therein." An express agreement among all the conspirators is not a necessary element of a civil conspiracy.  The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result.  To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was 'a single plan, the essential nature and general scope of which [was] know[n] to each person who is to be held responsible for its consequences.'

Frasier, 992 F.3d at 1024-25 (quoting Snell v. Tunnell, 920 F.2d 673, 702 (10th Cir.

1990)("Snell")(first alteration in original; the Court adds the second alteration)(citations

omitted)(quoting Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir. 1979), rev'd in part on other

grounds, 446 U.S. 754 (1980))).

Here, the question is whether the SAC contains sufficient factual content to permit the

Court to infer a meeting of the minds or general conspiratorial objective between Angel Sanchez

and Andres Sanchez.  See Defendants' Response at 10 ("Missing is any plausible allegations that

there was a meeting of the minds between Angel and Andres Sanchez . . . .").  The SAC provides

several factual allegations which, considered as a whole, allow the Court "to draw the reasonable

inference," Iqbal, 556 U.S. at 678, that Angel Sanchez and Andres Sanchez conspire to violate the

Plaintiff's Eighth and First Amendment rights under § 1983.  At this stage of the litigation, the

Defendants do not challenge the allegations' sufficiency against Andres Sanchez.  See Defendant's

Response at 2.  The narrower question, therefore, is the extent to which the SAC plausibly alleges

that Angel Sanchez knew of and participated in the alleged plan.

First, the SAC alleges facts suggesting motive.  The Plaintiff pleads that, in 2020, Angel Sanchez allegedly uses excessive force against him and that Andres Sanchez witnesses the incident, but does not report the incident.  See SAC ¶¶ 2-4, at 2 (stating that the Plaintiff "was a victim of excessive use of force by Correction Officer Angel Sanchez . . . . Correction Officer Andres Sanchez witnessed the excessive use of force by his brother and never reported it").  These allegations provide a basis from which the Court reasonably may infer that Angel Sanchez has an incentive to participate in Andres Sanchez' alleged objective to label the Plaintiff a "snitch."  SAC ¶ 140, at 37.  Angel Sanchez allegedly not only benefits from Andres Sanchez' failure to report the earlier incident, but also may have had reason to support Andres Sanchez in return.

Second, the SAC alleges coordinated conduct upon the Plaintiff's arrival at the Guadalupe Corrections in 2022.  The Plaintiff alleges that "he was met by STIU Sgt. Angel Sanchez and Sgt. Andres Sanchez and another GCCF employee."  SAC ¶ 12, at 4.  Angel Sanchez and Andres Sanchez then question the Plaintiff, asking "if he was going to have 'problems' because he was 'APA,'" SAC ¶ 13, at 4, and expressing concern about "the lawsuit [the Plaintiff] had filed against them," SAC ¶ 14, at 4-5.  During that interaction, Angel Sanchez and Andres Sanchez "informed [that the Plaintiff] that each pod had an emergency call button and that if he had any emergency . . . all he need to do was press the emergency call button to receive emergency assistance from them and other Correction Officers."  SAC ¶ 15, at 5.

When the Court evaluates similar allegations in the FAC, it concludes that "Angel Sanchez and Andres Sanchez' actions 'encompass a wide swath of conduct, much of it innocent,' Robbins v. Oklahoma, 549 F.3d at 1247, and 'do not permit the court to infer more than the more possibility of misconduct,' Ashcroft v. Iqbal, 556 U.S. at 679."  MO at 41.  The SAC, however, supplements those earlier allegations with additional factual content.  The SAC alleges that Witness Two, after UNMH treats him for wounds he sustains following the assault on the Plaintiff, is likewise met

- 60 -

upon his return by Angel Sanchez and Andres Sanchez.  See SAC ¶ 39, at 11. According to the SAC, Angel Sanchez and Andres Sanchez took Witness Two "into an office with a blind spot from the camera and told the escort officer to leave."  SAC ¶ 39, at 11.  In that location, hidden from camera view, Angel Sanchez and Andres Sanchez question Witness Two in a manner that allegedly caused him to deny knowing who Andres Sanchez was and to fear for his safety.  See SAC ¶ 39, at 11.  When the Court views the earlier interview with the Plaintiff in light of these additional allegations, it appears less benign than it did under the FAC.

Third, the SAC provides corroboration from Witness One and Witness Two regarding Andres Sanchez' conduct.  See SAC ¶¶ 29-31, at 7-8.  When the Court evaluates the FAC, the allegation that Angel Sanchez and Andres Sanchez arrange for inmates to assault the Plaintiff rests largely on "suspect timing."  MO at 40.  The SAC now adds specific facts that Andres Sanchez does arrange for inmates to assault the Plaintiff when he arrives at the Guadalupe Corrections.  Those additional details alter the plausibility analysis.  The lawsuit that Andres Sanchez allegedly shows inmates in E-Pod, Unit 2 implicates both brothers.  See SAC ¶ 140, 137.  Both brothers are present during the Plaintiff's initial interview at the Guadalupe Corrections before the assault, see SAC ¶ 13, at 4, and both allegedly remove Witness Two, who has first-hand knowledge of the events, to a camera blind spot following the assault to question him about Andres Sanchez, see SAC ¶ 39, at 11.  Taken together, these allegations provide contextual support for an inference of shared objective.

Twombly requires courts to reject allegations that are merely conceivable rather than plausible.  See 550 U.S. at 570.  It does not, however, require courts to ignore reasonable inferences supported by factual context.  The SAC alleges that Angel Sanchez shares the same potential motive as Andres Sanchez, is present during the initial questioning of the Plaintiff, and is present during the post-assault questioning of Witness Two in a camera blind spot.  The Plaintiff need not

show "an express agreement" or that conspiracy participants "know all the details of the plan designed to achieve the objective or possess the same motive for desiring the intended conspiratorial result." Snell, 920 F.2d at 702. Considering the SAC as a whole, the Court concludes that the Plaintiff alleges sufficient factual matter to plausibly suggest a shared conspiratorial objective between Angel Sanchez and Andres Sanchez to retaliate against the Plaintiff for filing grievances by labeling him a "snitch."

**B.    THAT ANGEL SANCHEZ MAY INVOKE QUALIFIED IMMUNITY DOES NOT MAKE THE PLAINTIFF'S SECOND MOTION TO AMEND FUTILE.**

The Defendants argue that the Plaintiff's allegations against Angel Sanchez are too conclusory to state a claim and therefore Angel Sanchez is entitled to qualified immunity. See Defendants' Response at 11-12. Specifically, the Defendants argue that: (i) the Plaintiff's Eighth Amendment claim in Count I fails "to allege that Angel Sanchez had a 'sufficiently culpable state of mind' as required by Farmer v. Brennan, 511 U.S. 825, 534 (1994)"; and (ii) the Plaintiff's First Amendment retaliation claim in Count II fails "to allege that Angel Sanchez took any action which caused Plaintiff to suffer injuries that would chill a person of ordinary firmness from continuing to engage in the protected activity." Defendants' Response at 11.

To overcome qualified immunity, the Plaintiff must: (i) plausibly allege a violation of a Constitutional right; and (ii) demonstrate that the right clearly is established at the time of the alleged violation. See Frey v. Town of Jackson, 41 F.4th 1223, 1232 (10th Cir. 2022)(stating that a district court must decide in a two-part analysis: "(1) whether the plaintiff plausibly alleged a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the alleged violation"). "A right is clearly established 'when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains.'" Truman v. Orem City, 1 F. 4th 1227, 1235

(10th Cir. 2021)(quoting Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014)).  Courts "may address either prong first to achieve 'the fair and efficient disposition of each case.'" Frey v. Town of Jackson, 41 F.4th at 1232 (quoting Brown v. Montoya, 662 F.3d 1152, 1164 (10th Cir. 2011)).

The Court evaluates the Defendants' qualified immunity defense in the MO.  There, the Court concludes that the second prong of the qualified immunity analysis is satisfied but that the Plaintiff does not adequately plead the first prong.  See MO at 34-35.  Specifically, the Court concludes that "it is clearly established . . . that labeling a prisoner a snitch constitutes deliberate indifference" under the Eighth Amendment.  MO at 29 (quoting Benefield v. McDowall, 241 F.3d 1267, 1271 (10th Cir. 2001)).  The Court nevertheless determines that the Plaintiff does not sufficiently plead facts to satisfy the first prong of the qualified immunity analysis.  See MO at 35 ("[T]he Court concludes that he has 'not nudged [his] claims across the line from conceivable to plausible.'" (quoting Twombly, 550 U.S. at 570)(alterations in MO but not in Twombly)).  The Plaintiff remedies that deficiency in the SAC with respect to the Eighth Amendment claim, as the Court explains above when evaluating the Plaintiff's conspiracy allegations.  Accordingly, the remaining question is whether the Plaintiff's First Amendment retaliation claim against Angel Sanchez satisfies the qualified immunity analysis.

The Court concludes that the Plaintiff's right to be free from prison officials' retaliation for exercising his First Amendment rights is clearly established at the time of the alleged inmate attack.  See Requena v. Roberts, 893 F.3d 1195, 1211 (10th Cir. 2018)("'It is well-settled that prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts.'" (quoting Gee v. Pacheco, 627 F.3d 1178, 1189 (10th Cir. 2010))).  The Defendants do not dispute that this right clearly is established.  Instead, they argue that the Plaintiff has failed to plausibly allege a Constitutional violation.  See Defendants' Response at 11.

To state a claim for First Amendment retaliation, the Plaintiff must plead the following elements: (i) he is engaged in Constitutionally protected activity; (ii) Angel Sanchez' actions cause the Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) the Plaintiff's exercise of constitutionally protected conduct substantially motivates Angel Sanchez' response. See Requena v. Roberts, 893 F.3d at 1211. The Defendants contend that the Plaintiff fails plausibly to allege the second element, arguing that Angel Sanchez' conduct would not chill a person of ordinary firmness from continuing to engage in protected activity. See Defendants' Response at 11.

The Court disagrees with the Defendants' position. As discussed above, the Court concludes that the Plaintiff plausibly alleges that Angel Sanchez participates in a conspiracy to label the Plaintiff a "snitch," which results in fellow inmates stabbing and beating Plaintiff multiple times. See SAC ¶ 75, at 20. The Plaintiff further alleges that a violent attack, which correction officers orchestrate, would deter inmates from exercising their First Amendment rights to file grievances or pursue legal action. See SAC ¶ 32, at 9. The SAC also alleges that, as a result of the attack, the Plaintiff continues to suffer emotional distress, and NMCD confines him to segregation for twenty-three hours a day for his protection. See SAC ¶¶ 69-71, at 19-20. The Defendants offer no authority suggesting this conduct would not chill a person of ordinary firmness from exercising his First Amendment rights. At the pleading stage, the Plaintiff's allegations plausibly support such an inference. The Court therefore concludes that the Plaintiff adequately pleads a First Amendment retaliation claim and that qualified immunity does not bar the claim at this stage.

Accordingly, the Court concludes that the Second Motion to Amend is not futile with respect to the § 1983 claims asserted against Angel Sanchez in Count I, Count II, and Count III.

Having considered the Defendants' arguments concerning those claims, the Court next considers whether the same conclusion follows for the Plaintiff's proposed § 1985 claim

### C.   THE PLAINTIFF DOES NOT ALLEGE A PLAUSIBLE CONSPIRATORIAL CLAIM UNDER § 1985.

The Tenth Circuit recognizes "many differences exist between § 1983 and § 1985 for the purpose of alleging an actionable conspiracy." Brooks v. Gaenzle, 614 F.3d 1213, 1227 (10th Cir. 2010), abrogated on other grounds by Torres v. Madrid, 592 U.S. 306 (2021)("Brooks")(citing Dixon v. City of Lawton, Okl., 898 F.2d 1443, 1447, 1449 n.6 (10th Cir. 1990)("Dixon")).  In Dixon, the Tenth Circuit states that

> a § 1983 claim generally describes a substantive violation of a right secured by the Constitution or laws, whereas a § 1985(3) claim generally describes a conspiracy of two or more persons for the purpose of depriving of another of equal protection of the laws or equal privileges and immunities under the laws.

898 F.2d at 1447.  The Tenth Circuit clarifies further that, although § 1983 may encompass conspiratorial conduct, proof of a conspiracy is not an element of a § 1983 claim.  See Dixon, 898 F.2d at 1447 (citing Harrison v. Springdale Water & Sewer Comm'n, 780 F.2d 1422, 1430 n. 14 (8th Cir.1986), and Bell v. City of Milwaukee, 746 F.2d 1205, 1255 n. 64 (7th Cir.1984)).  By contrast, § 1985(3) expressly requires proof a conspiracy.  See Dixon, 898 F.2d at 1447.  The distinct purposes underlying § 1983 and § 1985(3) carry corresponding doctrinal requirements: § 1985(3) "requires proof that a conspirator's action was motivated by a class-based, invidiously discriminatory animus," but § 1983 carries no such requirement.  Dixon, 898 F.2d at 1447.  See Grove v. Groome, 817 F. App'x 551, 557 (10th Cir. 2020)(describing a motion to amend the complaint as futile, because the complaint's § 1985 claims do not contain "any allegations involving class-wide or racial discrimination").  Applying these principles here, the Court concludes that the SAC's § 1985 claims against Angel Sanchez and Andres Sanchez are futile.  The

SAC does not plausibly allege that either brother acts with the class-based or racially discriminatory animus that § 1985(3) requires.

The Court reaches a different conclusion with respect to the Plaintiff's § 1983 claims. As explained above, the Court concludes that the Plaintiff's proposed amendments concerning the § 1983 claims against Angel Sanchez are not futile, because the SAC contains sufficient factual allegations to meet the plausibility standard at the pleading stage. With respect to Andres Sanchez, the Defendants do not presently challenge the § 1983 allegations, see Defendants' Response at 2, and the Court therefore determines that granting the Second Motion to Amend as to those claims is appropriate and consistent with rule 15's instruction that courts should grant leave to amend freely when justice so requires. See Fed. R. Civ. P. 15(a)(2)

The § 1985 claims stand on different footing. As the Tenth Circuit makes clear, the elements of a § 1983 conspiracy claim are not coterminous with those of a § 1985(3) claim. See Brooks, 614 F.3d at 1227. To plead a viable § 1985 claim, the Plaintiff must allege facts supporting a reasonable inference that the Angel Sanchez and Andres Sanchez act with discriminatory purpose directed toward a protected class. See Dixon, 898 F.2d at 1447. The SAC does not plausibly make that showing. Apart from conclusory allegations or "formulaic recitations" directed at the NMCD, Iqbal, 556 U.S. at 678, the SAC does not allege facts suggesting that either Andres Sanchez or Angel Sanchez act because of class-based or racial discrimination. See SAC ¶ 165, at 43 ("The NMCD discriminates against inmates who qualify under the 'Acts' solely because of their disabilities."). To the contrary, the SAC alleges that the brothers act in retaliation for the Plaintiff's prior lawsuit against Angel Sanchez and Andres Sanchez. See SAC ¶ 145, at 39 (regarding Count I: "the Defendants retaliated against him by labeling him a 'snitch' . . . for filing a grievance and subsequentially the federal civil rights lawsuit"); SAC ¶ 156, at 41-42 (regarding Count II: "the Defendants' adverse action of labeling Plaintiff a 'snitch' was substantially motivated in response

to the Plaintiff's exercise of his constitutionally protected First Amendment right"); SAC ¶ 160, at 42 (regarding Count III: "the Defendants were retaliating against Plaintiff for asserting his legally protected constitutional rights").

Because the SAC does not allege plausibly the discriminatory animus which § 1985 requires to sustain a conspiracy claim, the Court concludes that granting the Second Motion to Amend as to those claims is inappropriate, because the amendments are futile. The Court therefore denies in part the Second Motion to Amend with respect to the § 1985 claims that the Plaintiff asserts in Count I, Count II, and Count III against Angel Sanchez and Andres Sanchez.

## II.    THE PLAINTIFF'S SECOND MOTION TO AMEND, REGARDING § 504 OF THE REHABILITATION ACT AND § 1231 OF THE ADA, IS FUTILE.

In Count IV, the Plaintiff alleges that NMCD violates § 1231 of the ADA and § 504 of the Rehabilitation Act of 1973. See SAC ¶¶ 161-65, at 43. Specifically, the Plaintiff alleges that NMCD discriminates against inmates with disabilities "by not providing inmates with assistance in filing or maintaining grievances so that they can exhaust administrative remedies required under the Prison Litigation Reform Act and New Mexico law." SAC ¶ 163, at 43.

The Court considers the Plaintiff's Rehabilitation Act arguments in the MO. See MO at 55-58. There, the Court concludes that the Plaintiff fails to state a claim under § 504 of the Rehabilitation Act, "because he has not alleged sufficiently that the Defendants discriminated against him on the basis of his disability." MO at 58. The SAC does little to cure this deficiency.

To state a claim under the Rehabilitation Act, a plaintiff must demonstrate that: (i) he or she is handicapped under the Act; (ii) he or she is otherwise qualified to participate in the program; (iii) the program receives federal financial assistance; and (iv) the program discriminates against the plaintiff based upon his or her disability. See Hollonbeck v. U.S. Olympic Comm., 513 F.3d at 1194. In the Rehabilitation Act and ADA context, "[c]ourts have recognized three ways to

establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." J.V. v. Albuquerque Pub. Sch., 813 F.3d 1289, 1295 (10th Cir. 2016). These standards require more than allegations that a plaintiff has a disability and experienced an adverse outcome. See MO at 57 (citing Nunes v. Mass. Dep't of Corr., 766 F.3d 136, 146 (1st Cir. 2014)(holding, in the context of a prisoner's claim against a prison system, that § 504 "entitle[s] [a disabled individual] to reasonable accommodations, not to optimal ones finely tuned to his preferences")). Rather, the complaint plausibly must allege that the NMCD's actions occur because of the Plaintiff's disability or that the NCMD fails to reasonably accommodate the disability in administering the relevant program or service. See J.V. v. Albuquerque Pub. Sch., 813 F.3d at 1299 (stating a public entity "must provide a reasonable accommodation under the ADA when it knows that the individual is disabled and 'requires an accommodation of some kind to participate in or receive the benefits of its services'" (quoting Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d 1185, 1197 (10th Cir. 2007)).

The SAC provides additional factual allegations concerning NMCD's knowledge of the Plaintiff's disability. See SAC ¶ 129, at 34 (describing the mental health evaluations that NMCD performs when inmates enter the system). The SAC does not allege plausibly, however, that NMCD acts because of the Plaintiff's disability. Apart from a "formulaic recitation of the elements of a cause of action," the SAC contains no factual allegations supporting an inference that NMCD discriminates against the Plaintiff on the basis of his disability or that NMCD denies his accommodation request. See SAC ¶ 107, at 28 ("The Plaintiff has established that the NMCD's discrimination against him was/is based solely on his disabilities and was/is intentional."); id. ¶ 108, at 29 ("The NMCD is deliberately indifferent to handicapped individuals as it pertains to the use of the grievance system . . . ."); id. ¶ 111, at 29 ("The discrimination against Plaintiff is based solely [sic] his disability."). The Court accepts as true that NMCD knew of the Plaintiff's

disability, but that fact alone does not transform his interaction with Sedillo into a Rehabilitation Act or ADA violation.

Indeed, the SAC acknowledges that the Plaintiff intends to develop evidence during the course of litigation regarding discrimination against other handicapped inmates or deliberate indifference toward handicapped individuals as a group. See SAC ¶ 107, at 28 ("The Plaintiff will produce during the course of the litigation the allegations of discrimination . . . ."). The Court already has given, however, the Plaintiff an opportunity to supplement the FAC with additional factual allegations. Although the Plaintiff adds substantial factual detail regarding the § 1983 claims, he does not meaningfully supplement the allegations supporting his Rehabilitation Act and ADA claims. In this respect, the SAC largely remains unchanged from the FAC that the Court previously finds insufficient.

Because the SAC does not allege plausibly that NMCD discriminates against the Plaintiff because of his disability or fails to provide a reasonable accommodation, the Plaintiff has not stated a viable claim under the Rehabilitation Act or under the ADA. Accordingly, the Court denies the Second Motion to Amend with respect to Count IV.

### III. THE COURT DENIES IN PART THE SECOND MOTION TO AMEND AND DECLINES TO SEAL THE PROCEEDINGS, BUT WILL MASK CERTAIN AT-RISK IDENTITIES IN COURT FILINGS.

In the Second Motion to Amend, the Plaintiff requests that the Court order the identities of Witness One, Witness Two, and the Plaintiff "remain under seal." Second Motion to Amend ¶ 7, at 3. The Defendants oppose the motion to seal. See Defendants' Response at 1-2. At the hearing on August 14, 2025, the Plaintiff modifies his position, suggesting that the document remain open to the public, but the Court redact certain identities from Court filings. See 2025 Tr. at 12:6-19 (Court, Ayala)("Because the motion was to seal but now I'm hearing that you want to leave the document public but then [redact] the names of the two inmate witnesses . . . ."). Based on this

modification, the Defendants' position also changes.  See 2025 Tr. at 14:21-15:4 (Van Meter)(stating that, as "far as that goes, as far as the Court filing that and using such identifiers, I don't see any need to oppose that").  There remains uncertainty about what information the Plaintiff requests the Court to mask or redact from previous docket entries.  See 2025 Tr. at 21:7-9 (Court)("Well, let's do this.  Send me and Ms. Van Meter a letter of what you want sealed and then I'll take a look at that.").  The parties, however, agree that docket entries going forward will mask certain identities.  See 2025 Tr. at 21:25-22:6 ("I'm agreeable in my writing to use the word the plaintiff and then inmate witness one and two . . . . [A]nd I think Ms. Van Meter is agreeable to do that in her writing but I'm not sure we have an easy solution to [], the caption and I'm not sure we have a solution what to do with all the exhibits.").  Tenth Circuit precedent supports this approach.  See Luo v. Wang, 71 F.4th 1289, 1299 (10th Cir. 2023)(recognizing that "real danger of physical harm" constitutes an exceptional circumstance warranting some form of anonymity in judicial proceedings).  Given the allegations in this case, the Court concludes that a danger of physical harm exists.  Accordingly, the Court denies the Second Motion to Amend to the extent that it requests that the Court seal certain identities, but grants the motion in part by ordering that the identities of Witness One, Witness Two, and the Plaintiff be masked in certain Court filings going forward.

IV.    **THE COURT GRANTS THE SECOND MOTION TO AMEND, ALLOWING THE PLAINTIFF TO EXCEED THE NUMBER OF PAGES FOR EXHIBITS.**

Finally, the Court considers the Plaintiff's request for an extension of page numbers for the attached exhibits.  See Second Motion to Amend ¶ 8, at 3.  The Defendants do not oppose this request.  See Defendants' Response at 1.  Having reviewed the SAC and the accompanying exhibits, the Court sees no sound reason to deny the motion.  Accordingly, the Court grants the Second Motion to Amend to the extent it seeks an extension of page numbers for the exhibits.

**IT IS ORDERED** that: (i) the Plaintiff's Second Motion to Amend Complaint, for Extension of Number of Exhibit Pages, and Motion to Seal, filed April 27, 2025 (Doc. 106), is granted in part and denied in part; (ii) the Plaintiff may amend the Plaintiff's Amended Complaint for Violation of Constitutional [sic] Rights and Request for Declaratory and Injunctive Relief as it Pertains to the Fourteenth and Eight Amendment Violations and Discrimination Under the Americans with Disabilities [sic] Act, filed September 12, 2022 (Doc. 11), to include Count I, Count II, and Count III under 42 U.S.C. § 1983 against both Defendants Angel Sanchez and Andres Sanchez; (iii) the Plaintiff may not amend as to Count I, Count II, and Count III under 42 U.S.C. § 1985 against either Andres Sanchez or Angel Sanchez; (iv) the Plaintiff may not amend as to Count IV against Defendant New Mexico Corrections Facility; (v) future filings will mask certain identities consistent with this Memorandum, Opinion and Order; and (vi) the Plaintiff may exceed the number of pages of exhibits by thirty-two pages.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Shavon M. Ayala
Ayala P.C.
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

Jason Michael Burnette
Kari E. Cole
Lindsay Fay Van Meter
German • Burnette & Associates, LLC
Albuquerque, New Mexico

    *Attorneys for the Defendants*